FILED
COURT OF APPEALS
DIVISION II

2013 JUL -2 AM 9: 05

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

STEFANIE JEAN BENNETT, f/k/a
STEFANIE XITCO,

                Appellant,

    v.

JOHN MICHAEL XITCO,

                Respondent.

No. 42275-1-II

UNPUBLISHED OPINION

WORSWICK, C.J. — Stefanie Bennett appeals the trial court's parenting plan modification reducing her residential time with her children and increasing the residential time given to the children's father, John Xitco, and designating Xitco as the children's primary residential parent. Bennett argues that the trial court erred because (1) the trial court's findings that the children's environment was detrimental was an abuse of discretion, and (2) the trial court's findings do not support its conclusion that the benefits of modification outweighed the harm to the children. We affirm.

## FACTS

### A. Procedural Facts

Bennett and Xitco have two children: NX, age 12, and CX, age 10 at the time of trial. The parties divorced in 2002, and a court entered a parenting plan.

The parenting plan was modified in 2008, providing that the children would normally reside with Xitco from Sunday through Tuesday or Wednesday and with Bennett for the rest of the week. The 2008 plan called for the parents to jointly decide issues of non-emergency

medical care, with disagreements being resolved by Dr. Larry Larson. Issues of religious upbringing were also to be decided jointly. The plan also called for the children to remain enrolled at St. Patrick's School unless the parents mutually agreed otherwise.

Xitco filed a petition to modify the parenting plan in 2010. The case proceeded to a bench trial. The primary issues developed at trial were:

- Bennett's unfounded domestic violence petitions and her calling the police on Xitco without good cause;
- Bennett unilaterally pulling the children from Thursday morning mass at St. Patrick's;
- The children's excessive tardiness and absence from school during Bennett's residential time; and
- Bennett's unilateral medical decisions for the children.

Clerk's Papers (CP) at 104. The facts adduced at trial relevant to each of these issues are set forth below.

B. *Substantive Facts*

1. *Bennett's Domestic Violence Petitions and Calling the Police*

Bennett filed two petitions for domestic violence protection orders against Xitco. The only evidence regarding these petitions was the testimony of witnesses; documentary evidence was not submitted. Bennett filed for the first order in December 2009. Bennett claimed that Xitco "refused to give the children back and then [she] basically was fed up with being constantly threatened and [she] had had enough. And [she] felt like it was within [her] rights and in [her] best interest to stand up and say, you know, [she needed] protection from this person." 4 Report of Proceedings (RP) at 492. Bennett's petition for a protection order was denied, and Xitco was never served in connection with this petition.

Bennett petitioned for the second domestic violence protection order in February 2010. According to Bennett, she filed for the order after an incident where Xitco screamed at her in front of the children at her house. In that same petition, Bennett also described a different incident outside on her porch where Bennett thought Xitco was going to hit her. Bennett admitted that she had hit Xitco in the stomach during this incident, but she claimed that it was only because he frightened her by coming close with an upraised hand. Bennett obtained a temporary protection order, but the court denied her petition for a final order.

According to Xitco, Bennett had charged at him and punched him in the abdomen during the incident, leaving a bruise, after he mentioned her decision to unilaterally pull the children from mass at St. Patrick's. James Cathcart, the guardian ad litem who interviewed the parties, was unable to conclude that Xitco committed domestic violence.

Bennett also called the police on one occasion for a "well child check." 4 RP at 504-05. On that occasion, NX was having a birthday party at Xitco's house. NX drove his dirt bike up a one lane private road that he had been forbidden to ride on. Xitco confronted NX, and took NX's dirt bike away as punishment. NX threw a "fit" and called his dad an "asshole" and started to run away, but Xitco grabbed NX's wrist and told him not to talk to adults that way. 1 RP at 107. NX then ran away down the beach. Xitco immediately e-mailed Bennett to explain what had happened.

NX then called Bennett, and he hysterically told her that Xitco had called him an "asshole," and that Xitco had twisted his arm behind his back and hurt his shoulder. Bennett called the police. Bennett did not read Xitco's e-mail until later. The police, on arriving at Xitco's house, found nothing amiss.

3

2. *Unilateral Withdrawal from Mass*

NX and CX attended St. Patrick's, a Catholic school, in accordance with the 2008 parenting plan. St. Patrick's held weekly mass on Thursday mornings. According to the school's principal, Frances Jordan, the Thursday mass was part of St. Patrick's curriculum. Jordan testified that mass provided benefits for the children; the children had a chance to lead prayers, which improved their public speaking, the children heard bible readings and a homily and had the opportunity to reflect on the readings, and the children learned to stay quiet during the services. About 20 percent of St. Patrick's students were not Catholic, but they were still expected to attend mass to learn "about respecting the Catholic faith, [and] being tolerant of other religions." 2 RP at 196. Students were graded for mass attendance.

Bennett was unhappy with NX and CX attending St. Patrick's. In 2010, Bennett sent Jordan a letter informing her that NX and CX would no longer attend Thursday mass. Bennett stated in the letter that her lawyer advised her that the school could not force the children to attend. Jordan testified that in her ten years at St. Patrick's, no other parents had formally pulled their children from mass as Bennett had done. At trial, Bennett claimed that her reasons for pulling the children from mass were, "we're all covered by the First Amendment," and that she did not think the children should be taking a Catholic communion. 3 RP at 459-60. Bennett admitted that she did not follow the parenting plan when unilaterally pulling the children from mass. Bennett testified that she was not aware of the children being ridiculed for not attending mass.

Xitco, in contrast, testified that the children's failure to attend mass affected their grades and affected them socially. "They get teased by the other kids for not going to [m]ass," he

stated. 1 RP at 78. Xitco believed it was important for the children to attend mass because they should follow the same curriculum as the rest of the school.

Cathcart, the guardian ad litem, testified, "I never got a sense that [Bennett] had cancelled the [m]ass attendance for any reason other than she could." 2 RP at 240. Cathcart believed that Bennett's decision to pull the children from mass "sounded like competition rather than one that was based on the interests of the children." 2 RP at 240.

### 3. *Tardiness and Absences*

Although the parties and multiple witnesses testified about the children's tardiness and absences from school while living with Bennett, Cathcart presented the most complete analysis. Cathcart testified that in the 2009-10 school year, and in the first half of 2011, the children were absent one day for every three they attended when Bennett was responsible for delivering them to school. Although Bennett attempted to justify these absences based on medical problems NX was purportedly having, she could not explain why CX was usually absent on the same days as NX.

Based on his review of attendance records, Cathcart calculated that NX missed 3.3 percent of school days and that CX missed slightly less when Xitco was responsible for taking them to school. But Cathcart calculated that NX missed 37 percent of school days and CX slightly less when Bennett was responsible for taking them to school. Bennett disputed these numbers during her testimony, claiming that she wrote down the correct attendance figures in a notebook. But Bennett did not have her notebook at trial. Bennett submitted no documentary evidence to dispute Cathcart's assessment.

Xitco submitted a summary of the children's attendance records from 2008 to 2010 that he had prepared based on school attendance sheets, which he also submitted. Xitco calculated that CX was absent 30 times in the 2008-09 school year and tardy 15 times. Xitco calculated that NX was absent 31 times that year and tardy 14 times. For the 2009-10 school year, Xitco calculated that CX was absent 20 times and tardy 22 times. Xitco calculated that NX was absent 26 times and tardy 32 times.

The children's 2009-10 and 2010-11 report cards were also submitted, which reported their total days absent and tardy. NX's 2009-10 report card reported that he was absent 25 times and tardy 30 times. CX's 2009-10 report card reported that she was absent 17 times and tardy 20 times. This report card bore a notation that CX was not counted tardy for missing Thursday mass; NX's report card did not have such a notation. The 2010-11 report cards reflected the first two trimesters of that school year. NX's report card for that year listed 6 absences and 14 days tardy. CX's report card listed 17 absences and 17 days tardy.

4. *Health Decisions*

According to Bennett, NX had been complaining of chronic stomach pain for the past two years. Bennett acknowledged that Dr. Larson, the designated physician to resolve medical care disputes in the 2008 parenting plan, found NX to be perfectly healthy. In approximately 2009, Bennett then took NX to a naturopath without consulting Xitco. Bennett testified that she simply chose not to follow the parenting plan when she decided to consult the naturopath.

Later, Dr. Larson referred NX to Dr. Pickens, who found that NX had a bacterial overgrowth and stool impaction. NX's symptoms improved with vitamin D and probiotic supplements.[1]

Xitco testified that he believed NX was healthy but that NX carried a lot of stress. And aside from the infection that Dr. Pickens found, Xitco agreed with Dr. Larson that there was nothing physically wrong with NX.

According to Cathcart, NX's stomach problems were primarily stress related. He reported that both Dr. Larson and NX's psychologist agreed that Bennett was projecting her own symptoms onto NX. Bennett had a severe condition called dysautonomia.[2] Cathcart also believed the symptoms NX reported were reflective of his mother's condition rather than any condition of his own.

Moreover, Cathcart testified that although Bennett believed that Xitco was sending NX to school when he was sick, the school did not report seeing NX show any symptoms of illness. In fact, according to Maory Lou Xitco, NX's grandmother, on one occasion when NX asked to go home sick and she told him he would have to lay in bed and rest without television, NX went back to class rather than go home.

Furthermore, Cathcart reported that Bennett subjected both NX *and* CX to "an awesome list" of diagnostic medical tests, "both invasive and noninvasive." 2 RP at 254. There was no evidence that CX had ever displayed symptoms of any medical problem that would justify

---

[1] Medical records from Dr. Pickens were not admitted and the record does not show when, precisely, NX visited him.

[2] Bennett testified that dysautonomia is an autonomic dysfunction. "Dysautonomia" is defined as the "[a]bnormal functioning of the autonomic nervous system." STEDMAN'S MEDICAL DICTIONARY 530 (26th ed.1995).

medical testing. Cathcart reported that Dr. Larson believed that the volume of tests was placing

an "emotional or physical" burden on the children. 2 RP at 254.

C.    *The Trial Court's Decision*

The trial court granted Xitco's petition to modify the parenting plan. The trial court

issued a letter ruling, the substance of which was set forth in a subsequent order on modification.

The trial court further issued a modified parenting plan.

In its order on modification, the trial court concluded:

> The children's environment under the custody decree/parenting plan/residential
> schedule is detrimental to the children's physical, mental or emotional health and
> the harm likely to be caused by a change in environment is outweighed by the
> advantage of a change to the children.

CP at 104. The trial court supported this conclusion with narrative findings and conclusions:

> Petitioner Father has met his burden to show that based upon facts that have risen
> [sic] since the 2008 modification, that a substantial change has occurred in the
> circumstances of the children and that the modification is in the best interest of
> the children and is necessary to serve their best interest.

> The limited psychological information about Ms. Bennett is troubling. She has
> refused to provide the full report to the court, but the Guardian ad litem summary
> shows a troubled profile on any of the tests given. She has used conflict in a
> manner that is likely to cause [long-term] harm to the children. She has
> unilaterally prohibited the children from attending a part of their school
> curriculum, namely Thursday morning mass. She has allowed them to miss an
> excessive number of days from school, which I believe is her "silent" protest over
> the children attending the parochial school which she originally agreed that they
> would attend. She has filed unfounded domestic violence petitions and called the
> police for well-child checks for no good reason. Her unilateral decision to [take
> "NX]" for a non-emergency doctor visit for a second opinion without notice to the
> Father is the other abuse.

> This passive-aggressive behavior has damaged the children and their relationship
> with the father. These two children are the only two at St. Pat's not attending
> mass. They are "out of the norm" and for developing children being "out of the
> norm" can have [long-term] negative consequences. Ms. Bennett knows how
> strongly Mr. Xitco feels about school attendance and she has deliberately allowed

8

this issue to become a weekly source of contention, in large part I see as her way to get back at him for his perceived slights towards her.

The emotional gamesmanship needs to end. These children are already using the parental fight to gain an advantage over their parents. The beach motorcycle incident is a prime example.

CP at 104-05.

The trial court accordingly issued a new parenting plan that placed the children with Bennett from Friday through Monday during school, and with Xitco for the rest of the week during school. The parenting plan further decreed that Bennett's residential time would be adjusted to end on Sunday if the children displayed a pattern of missing school on Mondays. The plan designated Xitco as the primary residential parent.

The trial court made several more significant findings in the parenting plan. The trial court found:

[Bennett's] involvement or conduct may have an adverse effect on the children's best interests because of the existence of the factors which follow:

The abusive use of conflict by the parent which creates the danger of serious damage to the children's psychological development, particularly, but not limited to filing frivolous petitions for protective orders against Father and calling police against Father for "well-child checks."

Other: Failure to ensure children are to school on time: consistent pattern of getting children to school late, numerous absences, and failure to support the school objectives and mission, particularly withholding the children from school [m]ass which is part of th [sic] curriculum which in turn is detrimentally affecting the children in the school setting.

CP at 122. The trial court also found:

The evidence has shown that should the father be primary caretaker the conflict issue will subside, and if the father's parenting plan is adopted he would be responsible for the school week transportation alleviating the absences and tardies

9

No. 42275-1-II

that have historically occurred on days mother has visitation, and further alleviating the social academic problems at school for the children.

CP at 126. Bennett appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

We review a trial court's decision to modify a parenting plan for abuse of discretion. *In re Marriage of Zigler*, 154 Wn. App. 803, 808, 226 P.3d 202 (2010). A court abuses its discretion if it relies on unsupported facts, if it applies the wrong legal standard, or if its decision is manifestly unreasonable. *Zigler*, 154 Wn. App. at 808-09. We review a trial court's findings of fact regarding modification for substantial evidence, defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. *In re Marriage of Chua*, 149 Wn. App. 147, 154, 202 P.3d 367 (2009); *In re Marriage of Akon*, 160 Wn. App. 48, 57, 248 P.3d 94 (2011). We further review whether the findings of fact support the conclusions of law. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). We review questions of law de novo. *Chua*, 149 Wn. App. at 154. We defer to the fact finder on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. *In re Parentage of J.H.*, 112 Wn. App. 486, 493 n.1, 49 P.3d 154 (2002).

Because changes in residence are highly disruptive to children, we employ a strong presumption against modification of a parenting plan. *In re Custody of Halls*, 126 Wn. App. 599, 607, 109 P.3d 15 (2005). The moving party bears the burden to show that a modification is appropriate under RCW 26.09.260. Under that statute,

> [T]he court shall not modify a prior custody decree or a parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the

10

nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child.

In applying this standard, the trial court "shall maintain the residential schedule established by the decree or parenting plan" unless one of four factors is met. RCW 26.09.260(2). The factor pertinent to this case is: "The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child." RCW 26.09.260(2)(c).

## II. DETRIMENTAL ENVIRONMENT

Bennett argues that the trial court abused its discretion by concluding that the children's environment was detrimental because (1) the detrimental environment the trial court relied on no longer existed, (2) the modification did not address the changed circumstances that justified modification, and (3) the detrimental environment the court found was insufficient to support modification. We disagree on all points.

A.    *Detrimental Environment Still Existed*

Bennett first contends that the trial court erred by concluding that the children's environment was detrimental because the detrimental conditions no longer existed at the time of trial. Bennett claims that (1) the unilateral withdrawal from mass was no longer an issue, and (2)

the children's attendance problems were no longer an issue.[3] Bennett's arguments on these points are premised on rearguing the facts, but substantial evidence supports the trial court's findings on these issues and Bennett's arguments fail.

As Bennett points out, RCW 26.09.260(2)(c) requires that the child's present environment be detrimental to support modification. This court has recognized that although evidence regarding the children's prior environment with a parent is relevant under RCW 26.09.260, the circumstances at the time of trial are "also probative." *In re Marriage of Ambrose*, 67 Wn. App. 103, 108, 834 P.2d 101 (1992). And a trial court errs by not considering "any and all relevant evidence," including the circumstances at the time of trial. *Ambrose*, 67 Wn. App. at 108-09. But here, even focusing only on the children's environment at the time of trial, which is a more restrictive standard than required, substantial evidence supported the trial court's findings of fact regarding their removal from mass and their attendance at school.

### 1. *Unilateral Withdrawal from Mass Was Still an Issue*

Bennett claims that the issue of mass attendance was "arguably" not an issue at the time of trial.[4] Br. of Appellant at 20, 22. But rather than supporting her apparent claim that the issue

---

[3] Bennett also argues in her reply brief that the trial court erred by finding that "the children's environment," as opposed to the children's *present* environment, was detrimental. Reply Br. of Appellant at 14. But this technical omission does not show an abuse of discretion. As set forth below, the trial court's findings of fact adequately addressed the children's present environment; the record does not show that the trial court applied the wrong legal standard.

[4] Bennett also argues that whether her unilateral withdrawal of the children from mass constituted a detriment is "really a matter of law for the court to decide on appeal," but she cites no law on this point. Br. of Appellant at 20-22. We do not address arguments unsupported by legal authority. *Escude v. King County Pub. Hosp. Dist. No. 2*, 117 Wn. App. 183, 190 n.4, 69 P.3d 895 (2003).

had been resolved at the time of trial, Bennett simply argues that it was never a problem in the first place. We disagree.

Bennett argues that her unilateral withdrawal of the children from mass was not detrimental to the children because it caused them no harm. But there was substantial evidence to the contrary. Xitco testified that the children were teased. Principal Jordan testified that mass attendance was an important part of the curriculum and had important benefits for students. She also testified that no other parents had unilaterally withdrawn their children from mass as Bennett had done.

The trial court found that failure to attend mass made NX and CX "'out of the norm,'" which could lead to negative consequences. CP at 104. Substantial evidence supports this finding. Bennett's argument on this point fails.

2. *Absence/Tardiness Issue Still Existed*

Bennett also argues that by the time of trial in 2011, the children's school attendance had improved and thus no longer constituted a detriment. We disagree.

Bennett argues that the attendance issues were resolved at the time of trial because NX's health had improved. But there was strong evidence that NX's health issues were not the true cause of the attendance problems. And Bennett could not explain why CX's absences generally overlapped with NX's. This evidence permits the inference that health issues were not the true reason for the children's attendance problems.

Rather, substantial evidence supports the trial court's finding that the true cause of the attendance problems was Bennett's "'silent' protest" over the children attending St. Patrick's. CP at 104. The evidence showed that Bennett's dislike of St. Patrick's existed at the time of

trial. Thus there was evidence that the true reason for the children's attendance problems was not resolved. The trial court properly found that the attendance problems were still part of the children's environment at the time of trial. Bennett's argument to the contrary fails.

B.    *Modification Addressed Change in Circumstances*

Bennett next argues that, because the attendance issues were resolved by the time of trial, the modified parenting plan was not relevant to the changed circumstances justifying the modification. We disagree.

A parenting plan may not be modified under RCW 26.09.260 unless (1) there has been a substantial change in circumstances, and (2) the modification is in the best interest of the child and is necessary to serve the best interest of the child. The basis for Bennett's argument is that there were no grounds for modification because the attendance issues had been resolved. But substantial evidence shows the attendance issues had not been resolved and Bennett's argument on this point fails.

C.    *Detrimental Environment Was Sufficient To Support Modification*

Bennett additionally argues that the findings of detriment to the children are insufficient to support modification of the parenting plan. Although she cites legal authority, she makes no reasoned argument that the trial court's findings of fact are insufficient to support modification. Rather, once again, she relies on rearguing the facts. Because substantial evidence supported the trial court's findings of fact, Bennett's argument on this point fails.

1. *Bennett Failed To Object to Psychological Information*

Bennett challenges the trial court's finding that "[t]he limited psychological information about Ms. Bennett is troubling." Br. of Appellant at 28. But because Bennett failed to challenge the evidence supporting this finding below, we do not consider her argument on this point.

Cathcart reported the limited information at issue, which included a psychologist's opinion:

> There was a significat elevation for compulsive personality style [in Bennett] . . . . There were indications that [Bennett] may have limited ability to comfortably manage interpersonal relationships, [and] may have little interest or expectation of engaging in collaborative relationships with others . . . . [Bennett] made considerable effort to present a self-favorable image, [and] failed to offer a fully open or candid approach to the testing process.

2 RP at 259-60. As Bennett points out, the psychologist's report was not admitted, and Cathcart was not a psychologist. Bennett thus seems to argue that the psychological opinion, admitted through Cathcart, was inadmissible. But Bennett did not object to this evidence at trial. She cannot raise the admissibility of Cathcart's testimony on this point for the first time on appeal. RAP 2.5(a). Nor does Bennett cite authority related to the evidence's admissibility as required. *Escude v. King County Pub. Hosp. Dist. No. 2,* 117 Wn. App. 183, 190 n.4, 69 P.3d 895 (2003). Thus, we do not consider Bennett's argument on this point.

2. *Bennett's Abusive Use of Conflict*

Bennett next argues that substantial evidence does not support the trial court's findings regarding her abusive use of conflict. We disagree.

A court may preclude or limit any provisions of the parenting plan if there is an abusive use of conflict by the parent that creates the danger of serious damage to the child's

psychological development. RCW 26.09.191(3)(e). This standard applies in parenting plan modification cases. *In re Marriage of Watson*, 132 Wn. App. 222, 232, 130 P.3d 915 (2006).

a. *Withdrawal from Mass*

Bennett claims that her withdrawal of the children from mass was not abusive use of conflict. But rather than make any legal argument on this point, she reargues her earlier claim that failure to attend mass did not harm the children. Bennett thus appears to be arguing that, because her actions were not detrimental, they could not constitute abusive use of conflict that was harmful to the children. This argument fails.

As we analyzed above, there was substantial evidence that the unilateral withdrawal from mass was detrimental to the children's environment. Bennett's attempt to reargue the facts on this point is unavailing.

b. *Attendance Issues*

Bennett next claims that the children's attendance problems were not abusive use of conflict because they were not detrimental to the children. But there was substantial evidence to support the trial court's findings to the contrary.

The trial court found that the children's poor school attendance caused them academic and social problems. The trial court also found that the school attendance was a source of conflict between the parents because of Xitco's strong feelings about school attendance, and found that this conflict posed a danger of serious psychological damage to the children. The trial court also found that the children's attendance issues put them "'out of the norm,'" which could lead to long-term negative consequences. CP at 104.

Xitco testified that tardiness harmed the children's values by failing to instill in them the value of timeliness and that it affected their grades. Principal Jordan testified that attendance was important because instructional time at school was the most important aspect of the curriculum and could not be replaced with homework. According to her, tardiness was a problem because the mornings are the best time for children to learn. Tardiness could also make a child the "odd man out," often leading to social problems. 2 RP at 200.

Bennett argues that, to the contrary, both children were doing well academically. But Jordan testified that NX's "attendance and dedication to study outside of school" had affected his grades. 2 RP at 223. She also testified that after CX's attendance in school had improved, there was a "positive effect." 2 RP at 224.

There was substantial evidence to support the trial court's findings that the attendance problems were detrimental academically and socially, as well as psychologically, because of the parental conflict that resulted. Bennett's argument on this point fails.

c. *Domestic Violence Petitions*

Bennett further claims that her petitions for domestic violence protective orders do not show abusive use of conflict. We disagree.

Bennett argues that her first petition could not constitute abusive use of conflict because she never served it on Xitco and, thus, it never led to any conflict. This argument is unavailing. Bennett failed to serve the first petition not because she wished to avoid creating conflict with Xitco, but because she was denied a temporary protective order. At trial, Bennett could provide only very vague reasons for having filed the petition, strongly supporting the trial court's finding that it was frivolous. Bennett cites no law and makes no reasonable argument that her filing a

17

frivolous petition fails to show abusive use of conflict simply because the petition was denied and she did not serve it. Although such a petition might not show abusive use of conflict in and of itself, it is certainly relevant.

Bennett further argues that the second petition, related to the porch incident, does not show abusive use of conflict because the petition was justified under her version of the facts. But Xitco gave a different version of the incident, wherein the only domestic violence was committed by Bennett. Cathcart was unable to conclude based on the parties' conflicting stories that any domestic violence had occurred. We defer to the trial court on conflicting evidence and questions of witness credibility, and the trial court had ample evidence from which to find that Bennett's second petition was unfounded. When viewed with the other findings, this finding properly supported the trial court's conclusion that Bennett engaged in an abusive use of conflict.

d. *Well Child Check*

Bennett next challenges the trial court's finding of fact that she called the police for well child checks "for no good reason." CP at 104; Br. of Appellant at 31. But the record shows that Bennett called the police based only on NX's account of what had happened. She did not attempt to contact Xitco about what had happened. There was substantial evidence that Bennett called the police for "no good reason" under these facts.[5]

---

[5] After arguing that the above facts did not support modification, Bennett claims that there was no evidence to support the trial court's finding that her passive aggressive behavior damaged the children and their relationship with their father. But Bennett's only argument on this point is to repeat the factual claims that we addressed above. Because substantial evidence supported the trial court's findings of fact, Bennett's argument on this point fails.

### III. ADVANTAGES OUTWEIGHED HARM

Bennett next argues that the trial court's findings of fact do not support its conclusion that the benefits of modification outweighed the harm to the children. Bennett argues that the trial court failed to find that (1) the children wanted more time with Xitco or less time with Bennett, (2) her home was unfit or that she was an unfit parent, (3) the modification "was to the advantage of the children," (4) the children were more attached to Xitco than to Bennett or that they would better "thrive" at Xitco's residence, or (5) any specific emotional harm might befall the children in "being taken from their mother's home."[6] Br. of Appellant at 36. Bennett's arguments on this point are without merit and her claim fails.

A. *Desires of the Children*

Bennett argues that modification was not warranted because neither of the children wanted additional time with Xitco or less time with her. But Bennett cites no law that the trial court here was required to issue findings regarding the children's wishes. We do not consider Bennett's argument on this point. *Escude*, 117 Wn. App. at 190 n.4.

B. *Unfitness of Bennett's Home and Parenting*

Bennett further argues that there was no evidence that her home was unfit or that she was an unfit parent. Again, Bennett fails to cite any law that this finding was required. Moreover, her argument is contrary to case law.

---

[6] Bennett also argues in passing that the evidence showed altercations between NX and Xitco. Bennett does not explain the relevance of this point within the context of her argument; she simply mentions the issue as if argument were unnecessary. We do not address issues raised with only passing treatment and without reasoned argument and do not address Bennett's argument on this point. *Stiles v. Kearney*, 168 Wn. App. 250, 266, 277 P.3d 9 (2012), *review denied*, 175 Wn.2d 1016 (2012).

We have held a finding that a parent is unfit is not required to modify a parenting plan under RCW 26.09.260. *In re Marriage of Velickoff*, 95 Wn. App. 346, 353, 968 P.2d 20 (1998). There is no rule that the trial court here was required to mention "fitness" in order to modify the parenting plan. The trial court's conclusion, that the children's environment was detrimental and that advantages of a change outweighed the harm, was sufficient.

C.    *Advantage to the Children*

Bennett also argues that the trial court failed to make any findings as to why the modified residential schedule was "to the advantage of the children." Br. of Appellant at 36. Although Bennett does not cite authority on this point, she appears to be arguing that the trial court failed to make part of the finding required under RCW 26.09.260(2)(c), that "the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child."[7] But Bennett is incorrect; the trial court found that a change of environment would be to the advantage of the children.

The trial court found in the modification order that Bennett permitted excessive absence and tardiness on the children's part and that she did so as part of her abusive use of conflict, which was likely to cause long-term harm to the children. And in the new parenting plan, the trial court found that the basis for restricting Bennett's residential time included "abusive use of conflict . . . which creates the danger of serious damage to the children's psychological

---

[7] Bennett cites *In re Marriage of Mangiola*, 46 Wn. App. 574, 578-79, 732 P.2d 163 (1987), for the proposition that modification is inappropriate when the moving party alleges no facts "tending to show the advantages of a change in custody outweigh the harmful effects of a change of custody." Br. of Appellant at 35. But *Mangiola* addressed a preliminary question not at issue here: whether a petitioner for a parenting plan modification had shown adequate cause for a hearing under RCW 26.09.270. The trial court granted Xitco a hearing on modification and Bennett does not assign error to that decision. *Mangiola* does not support Bennett's argument.

development." CP at 122. Also, the trial court found that under the new parenting plan, the childrens' attendance and tardiness problem would be alleviated because Xitco would now be mostly responsible for school transportation.

Thus, the trial court found that removing school attendance from Bennett's control would reduce conflict between the parties, alleviating the affects of the conflict on the children, as well as alleviating the effects of the children's absences and tardiness. Bennett is incorrect that the trial court failed to find that the new residential schedule was to the children's advantage.

D. *Attachment*

Bennett additionally argues that the trial court failed to make any findings that the children were more attached to Xitco or that they would better "thrive" at Xitco's residence. Br. of Appellant at 36. Again, Bennett fails to cite authority that such findings were mandatory. Bennett's argument on this point fails.

E. *Emotional Harm of Relocation*

Finally, Bennett argues that the trial court made no findings as to the emotional harm that might befall the children "in being taken from their mother's home."[8] Br. of Appellant at 36. Bennett cites no law that such findings were required, but she appears to be arguing that the trial court failed to make another part of the finding required under RCW 26.09.260(2)(c), that "[t]he child's present environment is detrimental to the child's physical, mental, or emotional health." Bennett is incorrect.

---

[8] Bennett misrepresents the trial court's order on this point. The children were not "taken" from her home; they were already residing part time with each parent. The modification order simply adjusted the residential schedule to give Bennett less residential time during the school year.

No. 42275-1-II

The trial court made several findings regarding the children's emotional health. The trial court found that Bennett's behavior has damaged the children's relationship with their father. It found that her pulling them from mass made them "out of the norm." CP at 104. It also found that her abusive use of conflict created the danger of "serious damage to the children's psychological development." CP at 122. Bennett's argument on this point is simply contrary to the record.

Finally, Bennett argues for the first time in her reply brief that the trial court erred by ordering modification as punishment for her violating the previous parenting plan. We do not consider issues raised for the first time in a reply brief and therefore do not address this issue. *In re Marriage of Bernard*, 165 Wn.2d 895, 908, 204 P.3d 907 (2009).

We hold that the trial court's findings supported its conclusion that the advantages of modification outweighed the harm of a residential change. We accordingly affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, C.J.

We concur:

Penoyar, J.

Bjorgen, J.

22