# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Marriage of

CHRISTINA MARIA QUINTANAR,
n/k/a ROBERTS,

        Appellant,

and

GREGORIO QUINTANAR,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 78294-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: December 16, 2019

LEACH, J. — Christina Roberts appeals the trial court's decision to change the primary residence of her son, M.Q. Roberts challenges several findings of fact. She also asserts that the court exceeded its authority, abused its discretion, made incorrect evidence decisions, and violated her right of procedural due process when it modified the parenting plan. Finally, she contends that a biased guardian ad litem (GAL) tainted the court's decision.

Substantial evidence supports the challenged findings. The trial court had authority to retain jurisdiction for a year to review the efficacy of its initial decision and, within that year, to implement a major modification. Because the court found grounds for a major modification and appropriately balanced the impact of

relocation on M.Q. against the harm of not relocating him, it did not abuse its discretion when it changed M.Q.'s primary residence. The trial court did not abuse its discretion in applying the missing witness rule, in making determinations about the weight of evidence, or in refusing to consider a letter sent directly to the court. Because Roberts had notice that the court had reserved making a final decision about changing M.Q.'s primary residence and intended to conduct a review hearing before making a final decision, the trial court did not violate Roberts's right to procedural due process. She also fails to establish that the GAL was biased. We affirm.

## FACTS[1]

Gregorio Quintanar and Christina Roberts divorced in 2009. They had one child, three-year-old M.Q. At that time, they agreed to a final parenting plan assigning primary residential time to Roberts. From 2009 to mid-2014, the parties did not follow the plan but agreed on scheduling M.Q.'s residential time with each parent. Sometime after the divorce, Deforest Brown, Roberts's current fiancé, began living with her.

At the time, Quintanar served in the Army. In June 2014, the military ordered him to relocate to Alaska. After Quintanar and his girlfriend, Joann

---

[1] This section is based, in part, on the trial court's uncontested findings. Unchallenged findings are verities on appeal. Estate of Nelson v. Dep't of Labor & Indus., 175 Wn. App. 718, 723, 308 P.3d 686 (2013). We include challenged findings only as a description of the trial court's actions.

Hazard, moved to Alaska, he and Roberts were unable to work together to parent M.Q. Quintanar and Hazard married in 2016. In 2017, Quintanar retired from the Army. He accepted a civilian job with an Alaskan communications company.

In November 2014, Roberts filed a petition requesting a minor modification in the parenting plan under RCW 26.09.260(5)(a) and (5)(b). She alleged that Quintanar's move to Alaska made it difficult to follow the existing plan. Quintanar did not object but reserved the right to amend his answer. In late December, the court found Roberts in contempt because she failed to make M.Q. available during Quintanar's residential time. The court adopted a temporary parenting plan that allocated M.Q.'s residential time with each parent during Quintanar's local, adjacent, and remote postings.

In May 2015, the court again found Roberts in contempt for failing to make M.Q. available to Quintanar during his residential time. In August 2015, Quintanar amended his answer to Roberts's petition to include a counterpetition requesting a major modification of the parenting plan under RCW 26.09.260(1), (2)(c), and (2)(d). He requested a temporary parenting plan placing M.Q.'s primary residence with him. The court appointed Cynthia Bemis as GAL. The parties stipulated to adequate cause for a trial on Quintanar's major modification request.

In late 2015, as a result of a misunderstanding about Roberts's payment of Bemis's retainer, the court commissioner struck Roberts's pleadings and granted Quintanar ex parte relief, modifying the parenting plan and placing M.Q.'s primary residential time with him. The same day, Quintanar picked M.Q. up from school and moved him to Alaska. The court later vacated the default relief and entered a temporary parenting plan that restored M.Q.'s primary residence to Roberts.

In early March 2016, Quintanar asked the court to modify the temporary parenting plan and appoint a GAL for M.Q. The court modified the plan to allow video phone calls, discharged Bemis as GAL, and appointed Margaret Fowler as GAL. The court also reinstated Roberts's stricken pleadings.

The court held a trial in May 2017. Neither Brown nor Hazard testified. The court applied the missing witness rule to Brown because he did not testify. It did not apply the rule to Hazard, who was absent because of a work-related event. The court explained that Hazard did not seem to the court "to be central to this case as was . . . Brown [g]iven his history and the fact that he automatically brings [RCW 26.09].191 factors to the petitioner's side."

The trial court found grounds for both a minor and major modification of the parenting plan. It made extensive findings. It summarized much of its decision in these paragraphs:

The Court has considered the factors in RCW 26.09.260. The Court finds, based upon facts and circumstances that have arisen since the divorce decree and parenting plan entered in 2009, that a substantial change has occurred in the circumstances of the child and Ms. Roberts. The Court finds that modification is in the best interests of [M.Q.], and is necessary to serve his best interests. The Court has found limiting factors with regarding to Ms. Roberts under RCW 26.09.191 that did not exist in 2009, that she has been found in contempt of court twice in the past three years, and that the level of conflict she and Mr. Brown engage in, particularly with [M.Q.] present, is detrimental to his mental and/or emotional health. The Court is not convinced this detrimental behavior has ceased on the part of Ms. Roberts and Mr. Brown.

Nevertheless, the Court is not, at this time, transferring the primary residence of [M.Q.] due to concerns that the negative impact of uprooting the child from his home and social system would outweigh the benefit to him at this time. However, the court is reserving ruling on whether the child's living situation with petitioner is so harmful to his physical, mental, or emotional health that it would be better for him to move to Alaska with his father.

The court entered a final parenting plan modifying the original 2009 parenting plan but maintaining primary residence with Roberts. The plan included increased residential time allocated to Quintanar and also placed limitations on Roberts and Brown. It required that Roberts "work to actively promote a positive relationship between" Quintanar and M.Q. It ordered her to "[a]ttend at least 10 hours of parenting classes focused on parenting children of divorce and the emotional impact of conflict between divorced parents on a child" and "to attend counseling sessions with" M.Q.'s Washington-based therapist,

Charles Bartlett, and M.Q. It stated that it would transfer primary residential time to Quintanar if Roberts failed to follow these treatment requirements.

The parenting plan contained a review provision:

> This plan is subject to review and change without additional findings of adequate cause for up to one year from today's date. Any violation of a provision of this order by Petitioner will be adequate cause for modification. This Court retains jurisdiction for one year to review the efficacy of this order.

> A Review Hearing is set for January 12, 2018 at 9:00 am. The Guardian Ad Litem Report is due to the parties and the court two weeks before that date.

The court directed the guardian ad litem to report to the court about the parties' compliance with its order, the status of M.Q.'s relationship with his father, and "thorough information about whether Petitioner's living situation is harmful to the child's physical, mental, or emotional health, to include thorough background checks and investigation of De Forest Brown or anyone else living in the home, interviews of neighbors, and other collateral sources." The court also directed the guardian ad litem to provide additional information about Hazard and her fitness to parent.

Neither party appealed.

The court held a three-day review hearing starting on January 12, 2018.[2] Hazard testified, but Brown did not. In its analysis, the court again applied the

_____

[2] The trial dates were January 12 and February 12 and 15, 2018.

missing witness doctrine to Brown and inferred that "Roberts thought that calling Mr. Brown as a witness would have been damaging to her case."

The court incorporated its June 23, 2017, findings of fact and entered additional findings. It reiterated "that the 2017 Final Parenting Plan was 'subject to review and change without additional findings of adequate cause for up to one year.'" It stated that it found, "based on the evidence presented at trial on January 12, February 12 and 15, 2018, that there has been a substantial change in circumstances since entry of the June 23, 2017 Final Parenting Plan warranting further modification of the parenting plan." The court entered a final parenting plan modifying the 2017 plan and placing M.Q.'s primary residence with Quintanar. It maintained limitations on Roberts under RCW 26.09.191(2)(a), (2)(b), and (3) based on its concerns about Brown. The court ordered Quintanar to "continue to attend therapy with [M.Q.] until such time as the therapist determines that it is no longer beneficial."

Roberts appeals.

## ANALYSIS

Roberts contends the trial court should not have adopted the March 16, 2018, order and parenting plan changing M.Q.'s primary residence from her home to Quintanar's. Because substantial evidence supports the trial court's findings, the trial court did not exceed its authority, and the trial court did not

violate her procedural due process rights or abuse its discretion in its evidentiary or final decisions, we affirm.

## Substantial Evidence Supports the Findings

Roberts assigns error to various findings of facts made by the trial court on June 23, 2017, and March 16, 2018.[3]

This court reviews the record to decide if substantial evidence supports a trial court's findings of fact.[4] Substantial evidence exists when the record includes enough evidence to persuade a fair-minded, rational person of the truth of the finding.[5] "Appellate courts do not hear or weigh evidence, find facts, or substitute their opinions for those of the trier-of-fact."[6] An appellate court accepts unchallenged findings as true on appeal.[7]

First, Roberts challenges findings stating that Roberts and Brown disrupted M.Q.'s relationship with Quintanar, that they fostered the idea that

---

[3] She highlighted most of the challenged findings in the appendix to her opening brief. She addresses a subset of the highlighted findings as well as nonhighlighted findings in the body of her brief.

[4] Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc., 102 Wn. App. 422, 425, 10 P.3d 417 (2000).

[5] In re Marriage of Spreen, 107 Wn. App. 341, 346, 28 P.3d 769 (2001) (citing Bering v. SHARE, 106 Wn.2d 212, 220, 721 P.2d 918 (1986)).

[6] Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009) (citing Thorndike v. Hesperian Orchards, Inc., 54 Wn.2d 570, 572, 343 P.2d 183 (1959)).

[7] Nelson, 175 Wn. App. at 723.

Brown was more important than Quintanar, and that Brown "has caused serious damage" to M.Q.'s relationship with Quintanar.

The court made unchallenged findings describing Roberts withholding M.Q. from Quintanar and interfering with their relationship. For example, it found that "Christina Roberts has kept the other parent away from [M.Q.] for a long time, without good reason." It also found that she had not "followed the court's parenting/custody order. A court found her in contempt for disobeying the parenting schedule more than once in three years." It summarized testimony that described an incident when Roberts swore at Quintanar in front of M.Q.

The court also made unchallenged findings describing Brown actively interfering in the relationship between Quintanar and M.Q. For example, Brown

> encouraged [M.Q.] to spy on Mr. Quintanar and his wife. . . . Brown affirmed [M.Q.]'s spying behaviors by sending reply texts which stated "good job" as related to a photograph of a package of cigarettes in Ms. Hazard's car and "Merry Christmas" in response to a text containing a photograph of Ms. Hazard and her former husband.

Finally, the court made unchallenged findings describing M.Q. as distant from his father after they were separated for long periods of time and detailing his expression of negative feelings against his father. For example,

> After father's day in June 2014, Mr. Quintanar did not see [M.Q.] until spring break 2015. The Court finds that Mr. Quintanar called and left messages attempting to contact [M.Q.] through Ms. Roberts, but these calls were never returned. Mr. Quintanar was next able to see [M.Q.] after a court order, but their relationship was

somewhat strained. The Court finds that prior to June 2014, Mr. Quintanar and [M.Q.] had a very positive relationship as shown through testimony and [M.Q.]'s entries in [his notebook].[8]

Also, the court made an unchallenged finding that M.Q. "wrote 'Jonni [Hazard] picks on me, Greg [Quintanar] is OK with it, 'Die' and [included a drawing of] both of them hanging and [M.Q.] standing to the side crying," and that he "wrote a song called 'Let me be' expressing his desire to be with his mom and Mr. Brown."

So substantial evidence supports the findings that Roberts and Brown negatively interfered with M.Q.'s relationship with Quintanar.

Second, Roberts challenges the court's findings that conflict arising from Roberts's and Brown's behavior endangered M.Q.'s emotional safety and was harmful to his health. She also challenges the findings stating that Brown was M.Q.'s "primary father figure" in Roberts's home but was not an appropriate father-figure, had "engaged in inappropriate and harmful conduct in front of" M.Q., and that Roberts's choice to live with Brown created a harmful environment for M.Q. She challenges the finding that M.Q. needs a "more conflict-free home."

The court's unchallenged findings describe instances of conflict and volatility that M.Q. experienced as a result of Roberts's and Brown's conduct. For example, it found that Roberts swore at Quintanar in front of M.Q. The court

---

[8] This finding refers to exhibit 129, the notebook, but the parties did not include this exhibit in the record.

also found that M.Q. "repeated to a CPS [Child Protective Services] person that Mr. Brown put dog feces in his face."

The record includes substantial evidence that in choosing to live with Brown, Roberts endangered M.Q.'s health. For example, in its 2014 investigation of this incident, CPS reported that Roberts justified Brown's mistreatment of M.Q. and that she was "[i]nvolved in harmful relationships."

The court's unchallenged findings provide examples of how Brown was an inappropriate father figure and engaged in "harmful conduct" in front of M.Q. These findings also demonstrate that M.Q. would do better with less conflict. For example, one unchallenged finding states that Brown had a "history of Domestic Violence, [had] recently assaulted another person, [and] had multiple petitions for anti-harassment filed against him by various different individuals in 2012 and 2013." In another unchallenged finding, the court states,

> [Brown] pulled out of the garage in an SUV type vehicle believed to belong to Christina Roberts with [M.Q.] sitting in the front seat. As [the process server] was walking back to her truck, Mr. Brown rolled down his window and started yelling profanities at [her] over [M.Q.'s] head. These profanities included terms that are considered very derogatory toward women. She testified that [M.Q.] put his head down and covered his ears. Mr. Brown told [her] that if she ever stepped foot on his property that he would physically remove her. [She] said she understood and that she just had documents to serve on Christina. Mr. Brown then made a U-turn in the cul-de-sac and started driving towards [her] at a high rate of speed, which she estimated to be about 45 miles per hour. [She] thought Mr. Brown was going to run her down and got in front

-11-

of her truck to protect herself. [She] testified that [M.Q.] looked very shaken up.

So substantial evidence supports the court's findings that the conflict in Roberts's home, particularly that related to Brown's behavior, was harmful to M.Q. and that he needed a more conflict-free home.

Third, Roberts challenges the court's findings stating that there was a substantial change in circumstances between the 2009 parenting plan and the 2017 trial and its 2017 order and the 2018 hearing reviewing the efficacy of its order.

In unchallenged findings, the court identified several major changes in M.Q.'s and Roberts's circumstances that occurred between 2009 and 2017. These include

> 2. The mother has been found in contempt of court twice in the past three years;
>
> 3. The mother withheld the child from the father and prevented contact with the father for a prolonged period of time in 2014;
>
> 4. The mother began living with a man named De Forest Brown who has a history of Domestic Violence, has recently assaulted another person . . . , has had multiple petitions for anti-harassment filed against him by various different individuals in 2012 and 2013.

(Emphasis omitted.)

In another unchallenged finding, the court identified

> limiting factors with regard to Ms. Roberts under RCW 26.09.191 that did not exist in 2009, that she has been found in contempt of court twice in the past three years, and that the level of conflict she

and Mr. Brown engage in, particularly with [M.Q.] present, is detrimental to his mental and/or emotional health.

The court made unchallenged findings that describe changes in Roberts's and M.Q.'s circumstances between the 2017 and 2018 hearings:

2.  **Dog Feces.** [M.Q.] repeated to a CPS person that Mr. Brown put dog feces in his face.

3.  **Petition for Anti-Harassment Order.** Mr. Brown has had another petition for an anti-harassment order filed against him and an order granted.

4.  **New Person Filing for Anti-Harassment Order.** The person who filed the most recent petition for an anti-harassment order is not one of the same persons who before has filed such a petition against Mr. Brown.

5.  **Unrelated to Mr. Quintanar.** The person now filing the petition for an anti-harassment order against Mr. Brown is in no way related to Mr. Quintanar.

. . . .

11. **Spying.** Mr. Brown has encouraged [M.Q.] to spy on Mr. Quintanar and his wife.

12. **Affirmation of Spying Behavior.** Mr. Brown affirmed [M.Q.'s] spying behaviors by sending reply texts which stated "good job" as related to a photograph of a package of cigarettes in Ms. Hazard's car and "Merry Christmas" in response to a text containing a photograph of Ms. Hazard and her former husband.[9]

---

[9] Some of these findings referred to events that occurred between 2009 and 2017, but the court first learned of them in 2018, such as the CPS report regarding dog feces. Others refer to new events, such as the new petition for an antiharassment order against Brown.

In another unchallenged finding, the court states, "[T] he child's situation living primarily with petitioner has worsened" since 2017.

So substantial evidence supports the findings that M.Q. and Roberts experienced substantial changes in circumstances between 2009 and 2017 and between 2017 and 2018.

Fourth, Roberts challenges the 2018 finding that a change in residence was in M.Q.'s best interest.

As discussed above, several unchallenged findings describe excessive conflict in Roberts's house, inappropriate conduct by Brown in front of M.Q., and interference by both Brown and Roberts with M.Q.'s relationship with his father. In addition, conditions "worsened" between 2017 and 2018.

So substantial evidence supports the trial court's finding that a change in primary residence was in M.Q.'s best interest.

Fifth, Roberts challenges several additional findings. She challenges the finding that "[h]istorically, the relationship between the parents post-dissolution was such that Ms. Roberts dictated how things would work and Mr. Quintanar acquiesced." In her testimony, Roberts stated that before 2014, she regularly offered a schedule for M.Q. to Quintanar, and he accepted. Also, in e-mail during this time, Roberts often proposed a schedule, and Quintanar agreed.

Roberts testified that the conflict in residency started when Quintanar "wanted to revert back to the 2009 schedule." So substantial evidence supports this finding.

Roberts challenges the finding that "[t]he Court finds that [M.Q.] is very much afraid of upsetting or in any way disagreeing with his mother." The GAL testified that it was possible that M.Q. aligned with Roberts "in part from fear of her." So substantial evidence supports this finding.

Roberts challenges the finding that "[o]ne of Ms. Roberts' neighbors had property damaged during a conflict with Mr. Brown." The GAL testified about a confrontation with Brown and Roberts's neighbor about his lean-to. In her report, she described Brown breaking the welcome sign off the wall of the neighbor's porch. The neighbors told the GAL that the next day, the roof of the lean-to was destroyed and the gate lock was cut off. So substantial evidence supports this finding.

Finally, Roberts challenges the finding that "[a]lthough Ms. Roberts testified that [M.Q.] was asleep and was unaware of this incident, the Court finds that the potential for emotional and physical harm is high." Roberts challenges the following language from the court's otherwise unchallenged finding:

> On one occasion, Mr. Brown was arrested after the police breached Ms. Roberts'[s] door because she did not answer. Ms. Roberts testified that she was in the shower at the time the police arrived, although she knew they were looking for Mr. Brown. Ms. Roberts was handcuffed, and Mr. Brown was arrested leaving a neighbor's house.

Given this unchallenged portion of the finding, substantial evidence supports the trial court's final sentence stating that the potential for harm was high during such incidents.

Roberts fails to show that the challenged findings are not supported by substantial evidence. Instead, she asserts that the court ignored testimony of conflict at Quintanar's house and the stress caused by relocating M.Q. abruptly in December 2015. And she claims the contested findings cannot be "squared with the court's finding" that Roberts is a good mother and M.Q. is well adjusted. But this court reviews findings for substantial evidence and it does not "weigh evidence, find facts, or substitute [its] opinion[ ] for those of the trier-of-fact."[10] Even if other evidence contradicts it, this court accepts a finding supported by substantial evidence because credibility determinations are left to the trier of fact and are not subject to review.[11]

We conclude that substantial evidence supports the challenged findings.

## The Court Did Not Exceed Its Authority

Roberts asserts that the trial court exceeded its authority when it reopened and reweighed evidence at a review hearing after it had already entered findings and orders on the petitions to modify residence and the parenting plan following a full evidentiary hearing.

---

[10] Quinn, 153 Wn. App. at 717 (citing Thorndike, 54 Wn.2d at 572).
[11] State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

This court reviews a challenge to a trial court's authority de novo.[12] Trial courts receive their power over family law matters from the common law and statute.[13] Their equitable powers give them the authority to defer a final decision on a parenting plan under RCW 26.09.260 for a limited period of time.[14] This is true whether a court labels the parenting plan temporary or permanent.[15]

When it adopted the 2017 parenting plan, the court expressly deferred its final decision about a major modification and change in primary residence. While it found that a substantial change in circumstances had occurred and found grounds for a major modification, it stated that it had "concerns about the mother's home environment and Mr. Brown's behavior" and said it planned to review "the efficacy [of] its order" in January and possibly again in May "to see if a change is warranted and whether that change is, in fact transfer to Alaska." It stated that the parenting plan was "subject to review and change without additional findings of adequate cause for up to one year" after June 23, 2017. It scheduled its first review hearing for January 12, 2018.

The court had authority to retain jurisdiction, particularly because it expressed its intent to review the efficacy of its 2017 order.

---

[12] In re Marriage of Schneider, 173 Wn.2d 353, 358, 268 P.3d 215 (2011).

[13] In re Marriage of Possinger, 105 Wn. App. 326, 333, 19 P.3d 1109 (2001).

[14] In re Marriage of Adler, 131 Wn. App. 717, 725, 129 P.3d 293 (2006); In re Marriage of True, 104 Wn. App. 291, 298, 16 P.3d 646 (2000).

[15] Possinger, 105 Wn. App. at 337.

Roberts makes additional assertions to support her argument. None of these claims have merit.

First, Roberts contends that the court based its decision to impose a major modification in 2018 on different conditions or new facts and so exceeded the authority it retained by deferring its RCW 26.09.260 determination in its 2017 order.

The court here determined in its original order that there were grounds for a major modification. It supported its decision with additional facts, including the finding of worsening conditions, but it had sufficient grounds to modify the parenting plan based on its 2017 findings.

Second, Roberts asserts that the court made a finding in its 2017 order that "insufficient evidence" supported a determination that the benefit of removing M.Q. from her home outweighed the detriment of relocating him and so it could not find substantial evidence for this finding in 2018. But Roberts misrepresents what the court said in its 2017 order. Rather than make a finding on whether the benefit of a change in primary residence outweighed the harm, the court reserved making this decision until after it had the opportunity to review the efficacy of a minor modification. In 2018, it revisited this undecided issue and made a determination that a major modification was in M.Q.'s best interest based on its 2017 findings and additional evidence. We conclude that the trial court had

the authority to make the determination that a change in primary residence was in M.Q.'s best interest when it reviewed the efficacy of its 2017 order and parenting plan.

Roberts relies on In re Marriage of Watson,[16] where the court modified the parenting plan based on statutory grounds the petitioning party had not raised. Because the original petition in Watson alleged as the only grounds for a modification alleged sexual abuse that was not proved and the parties did not contemplate or argue other grounds for modification, the trial court lacked authority to modify the parenting plan or order continuing visitation restrictions in an amended temporary parenting plan.[17] This case is not like Watson. The trial court below based its decision on the factors the parties raised in their petitions for modification under RCW 26.09.260 and that were supported by substantial evidence.

### The Trial Court Did Not Abuse Its Discretion By Changing M.Q.'s Primary Residence

Roberts contends that the trial court abused its discretion by imposing a major modification and awarding Quintanar primary residence.

This court reviews decisions to modify a parenting plan for abuse of discretion.[18] There is a "strong presumption in favor of custodial continuity and

---

[16] 132 Wn. App. 222, 231-33, 130 P.3d 915 (2006).
[17] Watson, 132 Wn. App. at 233, 238-39.
[18] In re Marriage of Zigler, 154 Wn. App. 803, 808, 226 P.3d 202 (2010).

against modification."[19] But because "trial courts are given broad discretion in matters dealing with the welfare of children," this court will not disturb a trial court's decision to modify custody and visitation rights unless the trial court manifestly abused its discretion.[20] A trial court manifestly abuses its discretion when it makes an unreasonable decision or bases its decision on untenable grounds.[21]

> A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.[22]

A trial court is required to "determine[ ] and allocate[ ] the parties' parental responsibilities" on the basis of what it finds is in "the best interest of the child."[23] The best interest of a child is served by stability unless a change is "required to protect the child from physical, mental, or emotional harm."[24]

RCW 26.09.187 provides the criteria a trial court uses to establish a permanent parenting plan. Once a parenting plan is established, a court has

---

[19] In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993).
[20] McDole, 122 Wn.2d at 610; In re Marriage of Fiorito, 112 Wn. App. 657, 664, 50 P.3d 298 (2002).
[21] In re Marriage of Littlefield, 133 Wn. 2d 39, 47, 940 P.2d 1362 (1997) (citing State v. Rundquist, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)).
[22] Littlefield, 133 Wn.2d at 47 (citing Rundquist, 79 Wn. App. at 793).
[23] RCW 26.09.002.
[24] RCW 26.09.002.

authority to modify the plan under RCW 26.09.260. A court may make a major modification, including a change in the primary residence of a child, if it concludes that

> upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child.[25]

If a court finds a substantial change in circumstances has occurred, it may change the residential schedule if it determines that

> (c) The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child; or
> (d) The court has found the nonmoving parent in contempt of court at least twice within three years because the parent failed to comply with the residential time provisions in the court-ordered parenting plan. [26]

One action that is detrimental to a child's best interests is "[i]nterference with [a parent's] relationship" to that child.[27]

As discussed above, the trial court made findings that M.Q. and Roberts experienced substantial changes in circumstances between 2009 and 2017 because she had been the subject of two contempt orders from the court, she

---

[25] RCW 26.09.260(1).
[26] RCW 26.09.260(2).
[27] In re Marriage of Velickoff, 95 Wn. App. 346, 357, 968 P.2d 20 (1998).

withheld M.Q. from Quintanar in 2014, and she entered into a relationship with Brown. These findings satisfy RCW 26.09.260(1).

The trial court found multiple instances when Roberts and Brown interfered with M.Q.'s relationship with his father. It also found that the environment at Roberts's house risked and was causing emotional and physical harm to M.Q., particularly through Roberts's and Brown's use of conflict. The trial court explicitly weighed the impact of moving M.Q. against the harm he had experienced and would experience if he remained in Roberts's home. With this analysis, it determined that this harm outweighed the damage a change in primary residence might inflict. These findings satisfied RCW 26.09.260(2)(c).

Also, the court determined that Roberts was found in contempt of court "for disobeying the parenting schedule more than once in three years." This satisfied RCW 26.09.260(2)(d).

So the court had sufficient grounds and conducted the proper balancing analysis when it decided to change M.Q.'s primary residence. It did not abuse its discretion.

Roberts makes several claims to support her argument. None have merit.

First, she contends that the court abused its discretion because it "erroneously prioritized" M.Q.'s relationship with Quintanar over his best interests. But here she asks this court to do something it may not do, that is,

reweigh evidence.[28]  And, as discussed above, the court's grounds for its major modification were based primarily on its findings that M.Q. was harmed and at risk of harm in Roberts's home and that she had withheld M.Q. contrary to law. They were not based on Quintanar's relationship with M.Q.

Second, Roberts claims that the court overlooked Quintanar's role in his relationship with M.Q.  Again, this court does not weigh evidence; it defers to the trial court about the weight to give evidence.[29]  And the trial court did address Quintanar's role.  For example, it said in 2017, "The father's relationship needs to improve and be fostered.  And obviously he needs to play a role in that as well."

Third, Roberts contends that the trial court impermissibly applied "a kind of variation on the 'friendly parent' concept."  "Under the 'friendly parent' concept, primary residential placement is awarded to the parent most likely to foster the child's relationship with the other parent."[30]  A court abuses its discretion when it employs this concept in making custody determinations.[31]  The court here did not employ the friendly parent concept.  Placement with Quintanar did not occur because the trial court believed that he was most likely to foster M.Q.'s relationship with the opposite parent.

---

[28] Quinn, 153 Wn. App. at 717 (citing Thorndike, 54 Wn.2d at 572).
[29] Quinn, 153 Wn. App. at 717 (citing Thorndike, 54 Wn.2d at 572).
[30] In re Marriage of Lawrence, 105 Wn. App. 683, 687, 20 P.3d 972 (2001).
[31] Lawrence, 105 Wn. App. at 687-88.

Fourth, Roberts asserts that the trial court should not have changed M.Q.'s primary residence because the court made no finding of domestic violence in Roberts's home. But, as stated above, the trial court made sufficient findings supported by substantial evidence to warrant its decision to make a major modification. Roberts cites no authority that requires the court to find domestic violence in a child's current primary residence before ordering a change in primary residence.

Fifth, Roberts make several assertions about the court's consideration of Brown's impact on M.Q. Roberts suggests the court was biased against Brown "who receive[d] no credit for the years of love and care he gave M.Q." She does not identify anything beyond an adverse result to support her bias claim. And she again asks this court to evaluate credibility and reweigh evidence. We repeat that this is not an appellate court's role. We note that the trial court's findings that Brown was "devoted to [M.Q.]" undercuts this claim.

Sixth, Roberts contends that the trial court should not have imposed restrictions on M.Q.'s residential time with her based upon Brown's conduct because it made no findings establishing any connection between this conduct and harm to M.Q. She asserts that Brown's conflicts were generally "historical" "and nearly all occurred outside M.Q.'s environment." She asserts that M.Q. "was thriving" in his mother's home, so Brown could not be harming him.

But Brown's actions were not all historical, and the court identified instances when Brown's behavior directly impacted M.Q. For example, M.Q. was with Brown, lowering his head and covering his ears, when Brown swore and drove at a process server. And M.Q. reported to CPS that "Brown put dog feces in his face." Also, Brown interfered directly with M.Q.'s relationship with Quintanar, encouraging him when he spied on Hazard. Roberts does not show the absence of any connection between Brown's behavior and harm to M.Q.

Seventh, Roberts asserts that the court abused its discretion because it awarded Quintanar primary residence without finding her an unfit parent. Roberts has advanced an incorrect requirement for modification. The statute authorizes a parenting plan modification if the child's living environment is "detrimental."[32] A determination that one parent's living environment is "detrimental" under RCW 26.09.260(2)(c) "does not necessarily hinge upon finding a parent unfit."[33] Also, the court made findings sufficient to support major modification under RCW 26.09.260(2)(d) because the court found Roberts in contempt of court twice in three years.

We conclude that the trial court did not abuse its discretion when it changed M.Q.'s primary residence from Roberts's home to Quintanar's home.

---

[32] RCW 26.09.260(2)(c).
[33] Velickoff, 95 Wn. App. at 353.

## Roberts Does Not Establish That the GAL Was Biased

Roberts contends that the GAL was biased and that her bias influenced the judge and tainted the proceedings.[34]

Roberts bases her bias claim on the GAL's two reports to the court, the first in 2017 and the second in 2018. But she did not object to Fowler's continued service as GAL after the 2017 trial and interim decision. Generally, a party may raise on appeal only those issues raised at the trial court.[35] While an appellant may raise an issue for the first time on appeal if it involves a manifest error affecting a constitutional right,[36] Roberts does not assert a manifest constitutional error with respect to this issue.

Also, Roberts fails to establish that the GAL was biased. The court appointed Fowler to be GAL in 2016. She submitted her first report in March 2017. After the trial in May, the court said in its final order, "Fowler's report did not provide much information in summarizing and explaining CPS and police contacts with Ms. Roberts and Mr. Brown." In addition there was limited collateral contact information." The court directed the GAL to

> provide a report to the court about the parties compliance with the court's order, the status of the child's relationship with his father, and thorough information about whether Petitioner's living situation

---

[34] Contrary to Quintanar's assertion, RCW 26.12.175(5) does not apply here.
[35] RAP 2.5(a).
[36] RAP 2.5(a).

is harmful to the child's physical, mental, or emotional health, to include thorough background checks and investigation of De Forest Brown or anyone else living in the home, interviews of neighbors, and other collateral sources.

It also directed the GAL to "provide additional information about Respondent's wife and her fitness to parent."

The GAL submitted a second report in January 2018. She testified during the 2018 hearing that she had followed the court's instruction by focusing on Brown's background. She conducted a background check and talked to his neighbors and members of his extended family. In her report, she did not distinguish between legal actions he initiated, those directed at him, and those ultimately dismissed. She also talked to Roberts's coworker, counselors working with M.Q. in Alaska and Washington, and Roberts's family. She did not speak to all potential collateral contacts.

Roberts's primary basis for her bias claim is that the GAL narrowly focused on investigating Brown. But the court's June 2017 order directed the GAL to focus on Brown. So Roberts's assertion of bias directed at the GAL's focus fails.

Rather than show a pattern of bias demonstrated by the record, Roberts baldly contends that it is "possible to infer" among other things "a closer relationship to Quintanar's local and experienced trial counsel" or "implicit bias against Brown, an African American man living with a white woman in

unincorporated Snohomish County." She contends that the GAL should have brought more "'balance' to her investigation, given the simple reality that Brown, because he is African-American, [was] likely to encounter racism in his community and more likely to have interactions with law enforcement." Trial courts make decisions based on evidence. Roberts did not present testimony from either Brown, persons who interacted with Brown, or neighbors to contradict the information supplied by the GAL and witnesses who did testify. Inflammatory accusations and character attacks are not a substitute for evidence.

Also, Roberts asserts that this case is similar to In re Marriage of Black.[37] In Black, the Washington Supreme Court concluded that the trial court abused its discretion because it considered the mother's sexual orientation in making its parenting decision.[38] It determined that the court inappropriately relied upon the GAL's recommendations that were based on the mother's sexuality.[39] It also determined that the GAL was biased because she made statements about the mother's sexuality, for example, referring to homosexuality as a "lifestyle choice."[40] This case is not like Black. Roberts fails to point to any statements by the GAL in this case showing explicit bias. She instead contends that the GAL

---

[37] 188 Wn.2d 114, 392 P.3d 1041 (2017).
[38] Black, 188 Wn.2d at 127.
[39] Black, 188 Wn.2d at 132-33.
[40] Black, 188 Wn.2d at 133.

ignored information. The trial court heard this argument and did not find it persuasive. Neither do we.

Finally, Roberts cites to GALR 2, the court rule guiding GALs in fulfilling their role. She contends that the GAL "conceded she ignored" the mandate under the rule to maintain "objectivity and the appearance of fairness."[41] But she misrepresents the GAL's testimony. The GAL conceded that she did not make a "balanced, full inquiry" but that she did not think additional investigation would change her recommendation to the court. Failing to conduct a balanced, full inquiry is not equivalent to failing to maintain "objectivity and the appearance of fairness." Roberts does not establish that the lack of a more robust investigation by the GAL was the result of bias rather than other factors.[42]

Roberts has not established that the GAL was biased in her report or testimony.

### The Trial Court Did Not Violate Roberts's Due Process

Roberts claims that the trial court denied her due process because the court did not tell her that she had to separate from Brown to avoid a change in M.Q.'s primary residential placement. This claim proceeds on a false premise—that the court made its decision because Roberts did not separate from Brown.

---

[41] GALR 2(b).
[42] For example, the illness and death of her husband.

This court reviews constitutional challenges de novo.[43] The Fourteenth Amendment to the United States Constitution guarantees procedural due process, which requires that the State provide an individual notice and an opportunity to be heard when it seeks to deprive a person of a protected interest.[44] A parent's protected interests include the right to exert control over and have custody of her child.[45]

Here, Roberts had notice and an opportunity to be heard before the trial court changed M.Q.'s primary custody. The court reserved its final decision on the major modification. It made findings sufficient to support a major modification, and it said explicitly "that things need to change." It stated that Roberts needed "to do better." And it said, "I certainly have a lot of concerns about what's going on" and identified "just way too may red flags with Mr. Brown to be ignored."

The trial court did not change M.Q.'s primary residence because Roberts violated an "unstated condition" that she separate from Brown. The court found grounds for a major modification in 2017 based on findings of conflict in M.Q.'s environment and the contempt orders against Roberts. The trial court's 2018

---

[43] In re Welfare of A.W., 182 Wn.2d 689, 701, 344 P.3d 1186 (2015) (citing City of Redmond v. Moore, 151 Wn.2d 664, 668, 91 P.3d 875 (2004)).

[44] Mathews v. Eldridge, 424 U.S. 319, 348, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

[45] In re Marriage of Chandola, 180 Wn.2d 632, 646, 327 P.3d 644 (2014) (quoting In re Custody of Smith, 137 Wn.2d 1, 14-15, 969 P.2d 21 (1998)).

decision to change M.Q.'s primary residence was based on its 2017 findings, as well as additional evidence that M.Q.'s environment had worsened and that Brown and Roberts continued to actively interfere with M.Q.'s relationship with Quintanar.

The trial court did not violate Roberts's right to procedural due process when it implemented the modified parenting plan.

Roberts compares this case to Halsted v. Sallee.[46] In Halsted, the trial court violated a father's right to due process by restricting his right to travel without giving him notice it was contemplating doing so.[47] In contrast, here, Roberts had notice of the court's concern about M.Q.'s environment and the potential for a major modification. This case is also unlike In re Marriage of Ebbighausen,[48] where the father was not present when the court made custody determinations. Roberts was present and testified.

Roberts also relies on Watson, where the trial court modified the parenting plan based on grounds not anticipated by the parties.[49] This case is not like Watson. Here, the trial court based its decision on statutory grounds raised by Quintanar in his counterpetition for a major modification.

---

[46] 31 Wn. App. 193, 639 P.2d 877 (1982).
[47] Halsted, 31 Wn. App. at 197.
[48] 42 Wn. App. 99, 102, 103-04, 708 P.2d 1220 (1985).
[49] Watson, 132 Wn. App. at 233.

<u>Challenges to Evidentiary Decisions</u>

Roberts challenges several evidentiary decisions by the court.

*A. Application of the Missing Witness Inference*

Roberts asserts that the trial court erred in applying the missing witness inference to Brown when he failed to testify.

Under the missing witness doctrine, "'where evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and, . . . he fails to do so,—the [fact finder] may draw an inference that it would be unfavorable to him.'"[50]

A court may apply the missing witness inference to a party if the witness was competent and "'peculiarly available' to one of the parties."[51] This means that

> there must have been such a community of interest between the party and the witness, or the party must have so superior an opportunity for knowledge of a witness, as in ordinary experience would have made it reasonably probable that the witness would have been called to testify for such party except for the fact that his testimony would have been damaging.[52]

---

[50] <u>State v. Blair</u>, 117 Wn.2d 479, 485-86, 816 P.2d 718 (1991) (first alteration in original) (quoting <u>State v. Davis</u>, 73 Wn.2d 271, 276, 438 P.2d 185 (1968)), <u>overruled on other grounds by State v. Abdulle</u>, 174 Wn.2d 411, 275 P.3d 1113 (2012).
[51] <u>Davis</u>, 73 Wn.2d at 276.
[52] <u>Davis</u>, 73 Wn.2d at 277.

The witness must be essential to the case such that his testimony would be not "merely cumulative, but important and necessary."[53]

After the trial in 2017, the court described its missing witness analysis about Brown and Hazard:

> Mr. Brown did not testify as a witness in this case. The Court finds the explanation provided by Ms. Roberts that she wanted to focus on [M.Q.] and not Mr. Brown was unsatisfactory. The Court has found that Mr. Brown is a significant influence in the child's life. From all indications, Mr. Brown is competent to testify as a witness.
>
> In this case, there is a very strong community of interest between Ms. Roberts and her boyfriend/fiancée [sic], Mr. Brown. There is no such community of interest with Mr. Quintanar, and in fact, the two are not on good terms at all. Therefore, Mr. Brown was "peculiarly available" to Ms. Roberts to be able to be called to testify. The court infers that Ms. Roberts thought that calling Mr. Brown as a witness would have been damaging to her case.
>
> Mr. Quintanar's wife, Joni Hazard, also did not testify. There was testimony that she was in Alaska for the grand opening of a restaurant at which she recently obtained employment. Additionally, she did not seem to be central to this case, contrary to Mr. Brown. The Court does not see the two missing witnesses in the same way, and does not find that the missing witness inference is appropriate with regard to Joni Hazard.

In 2018, following three days of hearings, the court decided to apply the missing witness inference again. It stated, "Mr. Brown again did not testify. Again, the court has no opportunity to assess Mr. Brown except as has been

---

[53] Wright v. Safeway Stores, Inc., 7 Wn.2d 341, 347, 109 P.2d 542 (1941) (quoting 10 RULING CASE LAW Evidence § 33 (1915)).

testified about him. The court infers that Ms. Roberts thought that calling Mr. Brown as a witness would have been damaging to her case."

In 2017, the court explicitly identified the conditions necessary for applying the missing witness inference to Brown. Roberts fails to point to evidence that these conditions changed between 2017 and 2018. So the court did not abuse its discretion by making the missing witness inference in 2017 or 2018.

Roberts contends that the court "fails ever to identify any missing evidence the missing witness might possess." She does not cite to any authority that requires a court to identify exactly what missing evidence the missing witness might produce. "'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'"[54] Roberts instead cites to State v. Dickamore.[55] The decision in Dickamore was not based on a failure to identify missing evidence. Instead, in Dickamore, the trial court properly refused to give a requested missing witness instruction because the testimony of the uncalled witness was cumulative of another witness's testimony.[56] Dickamore does not help her.

---

[54] State v. Logan, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000) (quoting Detteer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).
[55] 22 Wn. App. 851, 592 P.2d 681 (1979).
[56] Dickamore, 22 Wn. App. at 856-57.

## B. *Weight Given To Expert Opinions*

Roberts claims that the trial court erred because it gave no weight to expert opinions warning of harm to M.Q. through a change in his primary residence.[57] Roberts asks this court to do what it expressly does not do—weigh evidence.[58] This claim has no merit.

Courts routinely instruct jurors that they are not required to accept an expert's opinion.[59] The same is true for a judge hearing a bench trial.

## C. *Consideration of Bartlett's Letter*

Roberts asserts that the court should have considered a letter submitted by M.Q.'s therapist in Washington that he provided after he testified.[60] This court reviews a trial court's evidentiary decisions for abuse of discretion.[61] A trial court abuses its discretion when it makes a manifestly unreasonable decision or bases its decision on untenable grounds.[62]

---

[57] Roberts assigns error based on this claim but does not address this challenge in the body of her brief.

[58] Quinn, 153 Wn. App. at 717 (citing Thorndike, 54 Wn.2d at 572).

[59] 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 2.10, at 55 (7th ed. 2019).

[60] Roberts contends in a footnote that "the court refused to consider [Bartlett's update], despite having expressly ordered Bartlett to submit a report." Bartlett's e-mail was not a report submitted to the court, so this argument does not help her.

[61] Hollins v. Zbaraschuk, 200 Wn. App. 578, 580, 402 P.3d 907 (2017) (citing Hoskins v. Reich, 142 Wn. App. 557, 566, 174 P.3d 1250 (2008)), review denied, 189 Wn.2d 1042 (2018).

[62] In re Det. of Duncan, 167 Wn.2d 398, 402, 219 P.3d 666 (2009).

Bartlett e-mailed a letter to the trial judge's law clerk the evening before the last day of the review hearing and provided copies to counsel. After Quintanar's counsel completed his closing argument, Roberts's counsel referred to the letter in her closing argument. The court interrupted her to express its concerns about the letter. Roberts's counsel then asked, for the first time, that it be admitted as evidence. Opposing counsel objected. The trial court did not rule on the letter's admission, so it did not become part of the record.

Roberts notes the trial court's refusal to consider the letter in a footnote but provides no argument or citation to authority supporting her complaint. So we decline to consider it.

## CONCLUSION

We affirm. Substantial evidence supports the trial court's findings. The trial court had authority to reserve its decision about modifying M.Q.'s primary residence. Substantial evidence supports the trial court's decision to impose a major modification of the parenting plan. And Roberts does not show that the GAL was biased in her recommendations.

The court provided Roberts with notice that it was considering changing M.Q.'s primary residence because of its concerns about her home environment, particularly with respect to Brown's presence. So she does not demonstrate that

it denied her procedural due process. And she does not establish that the trial court abused its discretion when it made several evidentiary decisions.

_Leach, J._

WE CONCUR:

_Chun, J._          _Appelwick, C.J._