[No. 22315-5-II.   Division Two.   December 4, 1998.]

*In the Matter of the Marriage of* ANJEANETTE VELICKOFF, *Appellant,* and THOMAS A. VELICKOFF, *Respondent.*

*James E. Lobsenz* of *Carney, Badley, Smith & Spellman,* for appellant.

*John C. Andrews* of *Bishop, Cunningham & Andrews;* and *J. Scott Bougher* of *Law Office of Wecker & Hunko,* for respondent.

HUNT, J. — Anjeanette Klink appeals modification of a residential schedule and parenting plan under RCW 26.09.260, whereby the trial court changed her child's primary residence from the mother to the father, Thomas Velickoff. The trial court found the modification to be in the child's best interest because: (1) Klink had been held in contempt twice within the past three years for failure to comply with the residential schedule; and (2) Klink had obstructed Velickoff's parental relationship with the child. We affirm.

## FACTS

Anjeanette and Thomas Velickoff were married on Feb-

ruary 29, 1992. Their daughter, TMV, was born on April 25, 1992. During the marriage, the couple lived in a ménage a trois relationship; the third party was David Klink, Anjeanette Klink's current husband. On June 8, 1995, following a contested custody trial, the Kitsap County Superior Court dissolved the Velickoffs' marriage and approved a permanent parenting plan. The plan provided that TMV would reside primarily with Klink and reside one week per month with Velickoff, with a specific schedule for the school year and holidays.

Klink moved to Idaho Falls, Idaho; she married her current husband on December 8, 1995. Velickoff continues to reside in Bremerton, Washington. TMV traveled 14 hours to spend time with her father and 14 hours to return to her mother; the parents met to exchange her halfway between their two residences. Both parents demonstrated difficulty in cooperating with the parenting plan. The guardian ad litem (GAL) reported that Anjeanette Klink had interfered to the greatest extent, but noted that Velickoff's reaction was also improper.

Shortly after the court approved the final parenting plan, Velickoff summoned Klink into court, accusing her of child abuse following TMV's report that her mother had given her a large bruise on her forehead. The Kitsap County court requested Idaho child protective services (CPS) to investigate and required that the child be placed in preschool. In August 1995, one month later, there was a "mix-up" over where the parents were supposed to meet to hand off their daughter. Klink claimed she had called Velickoff and notified him of the new meeting place; Velickoff claimed she did not notify him of any change in the meeting place. The end result was that TMV did not spend her scheduled time with her father. On October 2, 1995, Velickoff filed a motion to show cause for contempt, claiming that Klink had interfered with his parental rights and that she was turning TMV against him. The court ruled that Klink was not in contempt.

In January 1996, Klink took TMV to a clinical social

worker to determine whether TMV was suffering detrimental effects from travelling between residences. The social worker concluded that travelling was detrimental. Klink also contacted an Idaho attorney to address the "travel issue" and to have jurisdiction transferred to Idaho.

Velickoff had his regular residential time with TMV in February 1996. He began writing Klink letters concerning the upcoming summer residential schedule. In one letter, Velickoff complained about their daughter's care and Klink's interference with telephone calls to TMV. In March, the trial court approved the summer residential schedule.

Klink claimed that when TMV returned from her March residence with Velickoff, TMV would not wear her underwear. After TMV's April time with Velickoff, TMV told the social worker that Velickoff had touched her "down there." Klink reported that TMV had told her the same thing. Nevertheless, after this disclosure, Klink allowed TMV to spend time with Velickoff the following weekend.

In May, Klink filed an emergency petition with the Idaho court to halt TMV's residential time with Velickoff. Idaho CPS was also notified and intervened in the matter. Klink denied Velickoff's residential time with their daughter in May and June 1996.

On June 10, 1996, Velickoff went to the Bremerton Police Department to clear up Klink's sexual abuse allegations. On June 11, 1996, he took and passed a polygraph examination. Velickoff also underwent a psychosexual evaluation, including a physiologic sexual arousal test using a Farrall Instruments penile transducer, which indicated that he was not sexually abusing the child.

TMV continued to disclose abuse to the social worker. TMV did not spend time with her father in June 1996. Velickoff filed an emergency protection order, claiming that the sexual abuse had occurred in the home of David and Anjeanette Klink. In July, TMV made more disclosures of inappropriate behavior by Velickoff. Klink again denied Velickoff residential time with TMV for the month of July.

On July 22, 1996, Velickoff filed a petition to modify the parenting plan. On August 2, 1996, the Kitsap County court

ordered residential time to continue as provided in the parenting plan. Velickoff again filed a motion alleging contempt by Klink, claiming that she had interfered with his court-ordered telephone visits with TMV. Velickoff kept a calendar of Klink's regular interferences with the telephone time provided in the parenting plan. This calendar shows that Klink interfered with Velickoff's telephone calls to TMV continually from May 1995 until the modification trial in June 1997.

TMV and Velickoff had their regular residential time in September, after which TMV made no disclosures of abuse. But in October, TMV made more disclosures of abuse to the social worker, who called Idaho CPS to report the possible abuse. Klink again denied residential time to Velickoff in October 1996. On November 12, 1996, Idaho CPS wrote a letter to Washington CPS stating that TMV was at high risk for sexual abuse by Velickoff. Three days later, the Kitsap County court ordered Klink to allow TMV residential time with Velickoff in November and to comply with the parenting plan until the modification trial in June. But Klink denied Velickoff residential time in November and December, stating that she felt the Idaho authorities had recommended against it.

In January 1997, Klink allowed Velickoff residential time with TMV, ostensibly because all tests indicated that he was not sexually abusing TMV. During this visit, Velickoff took TMV to Doctor Sebousek, alleging abuse by Klink or her husband. Washington CPS then took custody of TMV and placed her in foster care because CPS felt Klink was powerless to protect TMV from potential sexual abuse while under court order to allow residential time with Velickoff. The evidence available to CPS included: a physician's report that Velickoff had brought TMV to him, alleging abuse; and the letter from Idaho CPS indicating concern for TMV's welfare. A CPS employee testified that CPS preferred to err on the side of protection rather than risk the child's well-being.

Washington State commenced a dependency proceeding,

which was dismissed in March after the parties cleared up the allegations of sexual abuse. During this time, TMV was in foster care and made no disclosures of sexual abuse by Velickoff. Washington CPS did not determine that TMV had been sexually abused.

On April 18, 1997, the Kitsap County Superior Court found Anjeanette Klink in contempt for interfering with Velickoff's residential time during October, November, December, and January. Velickoff had no residential time with TMV in May.

A bench trial on the modification petition began on June 11, 1997. The trial court found Anjeanette Klink not credible based on her conflicting statements during trial and her previous false allegations that her father had sexually abused her when she was young. Evidence suggested that Klink had coached TMV in the sexual abuse allegations against Velickoff. In contrast, the court found Velickoff to be credible and not to be an abuser.

The court further found that Klink's continued attempts to destroy the parental relationship between TMV and Velickoff were detrimental to the child's well-being and that a change was in her best interest. The court modified TMV's residential schedule such that she would reside primarily with her father in Kitsap County, Washington. The court set a residential schedule that required Klink to travel to Kitsap county for her residential time with TMV.

## ANALYSIS
### I. Standard of Review

There is a strong presumption favoring continuity in a child's life, *In re Marriage of McDole*, 122 Wn.2d 604, 859 P.2d 1239 (1993). Nonetheless, a trial court may modify a parenting plan if a substantial change has occurred in the circumstances of the child or the nonmoving party, and such modification is necessary to serve the best interests of the child. RCW 26.09.260(1). We uphold the trial court's findings of fact if supported by substantial evidence. *McDole*, 122 Wn.2d 604, *Chapman v. Perera*, 41 Wn. App. 444,

704 P.2d 1224 (1985). We do not reverse a trial court's decision to modify a parenting plan under RCW 26.09.260 unless the trial court exercised its discretion in an untenable or manifestly unreasonable way. *McDole*, 122 Wn.2d 604.

## II. Parental Fitness

■ Klink argues that because the trial court did not find her to be an unfit parent, the court could not change the residential schedule of the parenting plan. We disagree. The statute allows modification of a parenting plan if the child's living environment is "detrimental." RCW 26.09-.260(2)(c). Such a finding does not necessarily hinge upon finding a parent unfit.

Klink's reliance on *George v. Helliar*, 62 Wn. App. 378, 814 P.2d 238 (1991), is misplaced. Division One noted that on remand,

> the court must focus solely on the suitability of [the mother's] present environment and must return [the child] to [the mother] unless the court makes findings that [the mother] is not a fit parent consistent with RCW 26.09.

*George*, 62 Wn. App. at 385.[1] We used this language from *George* to bolster the position that courts should look to the child's current residential situation rather than the situation at the time the petition was filed:

> We are simply saying that the trial court must consider any and all relevant evidence to determine if [the mother] is presently *a fit parent capable of providing a suitable home for the children*.

*In re Marriage of Ambrose*, 67 Wn. App. 103, 109, 834 P.2d 101 (1992) (emphasis added).

---

[1]In *George*, the father removed the child from the mother's home without her consent and then asserted that integration into his home justified modification of the decree. *George*, 62 Wn. App. at 384. The court ruled that such conduct cannot be condoned because such a "result would shift the burden in modification proceedings to the custodial parent named in the original decree to prove the fitness of the custodial home, contrary to the Legislature's intent." *Id.*

By definition, an unfit parent is incapable of providing a suitable home for a child. But it does not necessarily follow that all fit parents are capable of providing suitable environments for their children. The *Ambrose* court was clearly looking to overall suitability of the child's environment, not solely to fitness of the parent. RCW 26.09.260. Again, it is the "fitness" of the child's total environment that the court must determine. Although such determination should include assessment of parental fitness, it does not necessarily depend on that factor alone.[2]

### III. Substantial Evidence

Klink contends that (1) there is insufficient evidence to support the trial court's conclusion that the child's environment was detrimental to her; (2) the trial court did not weigh the harm of the existing environment against the advantage; and (3) there is no evidence that harm from the residential schedule change was outweighed by advantage to the child. We disagree.

### A. Present Environment

■■ The trial court based its decision to modify the parenting plan on two circumstances set forth in RCW 26.09.260(2)(c) and (d). First, subpart (d) allows residential schedule changes if the nonmoving party is found in contempt twice within three years. Second, subpart (c) allows modification if the child's present environment is detrimental to the child's health and the change is in the child's best interest. The trial court stated that the child's present environment was detrimental and change was in the child's best interest because of Klink's "effort to

---

[2]Courts have often found that although both parties are fit parents, modification of the parenting plan could be in the child's best interest. *In re Marriage of Stern*, 57 Wn. App. 707, 789 P.2d 807 (1990). "Parental fitness is but one part of the analysis when considering modification in a joint custody situation." *Id.* at 716; *In re Marriage of Murphy*, 48 Wn. App. 196, 737 P.2d 1319 (1987) (both parents fit, but best interests of the child better served by awarding custody to the mother); *In re Marriage of McDole*, 122 Wn.2d 604 (no mention of fitness or unfitness, court looked only to the best interests of the child).

terminate the father's parental relationship through willful violation of court orders and an aggressive scheme to manipulate the facts . . . ."

"Present environment of the child" means the environment contemporaneous with the time of trial. *Ambrose*, 67 Wn. App. at 107. Klink argues that her denial of Velickoff's visitation was no longer an issue at the time of trial because it had occurred in the past and the sexual abuse allegations had been clarified. Klink argues that the court, therefore, did not consider the "present" environment of the child at the time of trial. Her argument ignores that the trial court did not base its decision solely on past visitation denied because of alleged sexual abuse. Rather, it was Klink's continuous concerted efforts to undermine Velickoff's parental relationship with their daughter that caused the trial court to conclude that living with Klink constituted an environment detrimental to the child.

## B. Detrimental Environment

An effort by one parent to terminate the other parent's relationship with a child can be considered detrimental to the child, and modification based on such behavior is appropriate. *McDole*, 122 Wn.2d 604. Velickoff had kept a calendar and testified extensively about Klink's interference with his telephone calls to their daughter. Following a March 1996 Kitsap County Superior Court hearing concerning Velickoff's residential time with his daughter, Klink told Velickoff that "[p]laybacks are a bitch." The allegations of sexual abuse surfaced shortly thereafter, in April 1996. Based on these allegations of sexual abuse, Klink then deprived Velickoff of a substantial amount of residential time with their daughter. Klink also obstructed Velickoff's access to the child's medical records.

A Washington CPS employee testified that the child had exhibited no sexualized behavior while in CPS's care. The CPS employee also produced records indicating that an Idaho CPS employee, investigating the allegations of sexual

abuse, felt that someone had coached TMV into making allegations of sexual abuse. The guardian ad litem also strongly believed that Klink had coached the child through the sexual abuse allegations. After taking TMV into custody, Washington CPS was not concerned about possible sexual abuse of the child, but rather about the child's basic psychological state.

Finally, the trial court reviewed reports that Klink had previously lied when she charged her own father with sexual abuse. The trial court had independent reasons for doubting Klink's credibility, including its observation that Klink "had one of the most remarkable losses and resurrections of memory I have ever seen in a person. She answered—after awhile I started keeping count, and I think she answered 'I don't know' to about 30 or 40 percent of Mr. Velickoff's attorney's questions; but answered 'I don't know' to virtually none of her own attorney's questions."

Such evidence amply supports the trial court's finding that Klink was actively interfering with Velickoff's parental relationship with their child. There is no evidence in the record from which the trial court could have reasonably concluded that Klink's destructive behavior had ceased and would not recur in the future. It was a reasonable inference that her behavior would continue because Klink had continuously interfered with Velickoff and TMV's father-daughter relationship from the time of the original parenting plan order until the time of trial, a period of two years.

■ The findings of fact and conclusions of law from the original action establishing the parenting plan provide a baseline, deviation from which is useful in measuring detriment to the child. At the time of dissolution in 1995, the trial court found that "[TMV] at this time is a bright, happy, articulate, healthy child who is developing in a manner consistent with her age." In contrast, at the time of the modification and dependency hearings in 1997, Doctor Vance Sherman of the Kitsap Mental Health Center evaluated the child during the dependency action and diagnosed her with adjustment disorder. Michelle Manz, a clinical

psychologist, agreed with Dr. Sherman's diagnosis and was worried about the child's psychological state. Further, Manz testified that the child lived in a fantasy world and had poor boundaries.

Velickoff testified that his daughter was no longer making normal progress. He noted that when he would pick up TMV from Klink, TMV would act strange and bark like a puppy during the 14-hour ride to Bremerton. Velickoff was worried about the child's behavior and wanted to provide appropriate therapy. TMV's godfather, Scott Butcher, testified that her behavior had deteriorated since the divorce decree. Butcher's wife, TMV's godmother, Brandy, testified that she, too, had noted changes in the child's behavior. The guardian ad litem's report states that a "change for the worse has occurred in the home of the mother since the entry of the dissolution in that the mother has intentionally frustrated and sought to preclude [TMV]'s contact with her father." Velickoff testified that he felt pushed out of his daughter's life.

Again, it is the clear policy of the Washington Legislature to foster postdissolution relationships between a child and *each* parent. RCW 26.09.002. Interference with such relationship is detrimental to the child's best interests. *McDole*, 122 Wn.2d 604. Here, there is ample evidence of Klink's concerted efforts to destroy Velickoff's parental relationship with their daughter, to the child's detriment.

### C. Weighing Harm Against Advantage

█ Klink asserts that the trial court did not weigh the harm caused by the child's change of residence against the advantage of the change. Confronting the same issue in *In re Marriage of Murphy*, Division Three reasoned that, although the trial court did not expressly weigh the detriment versus the advantage of the proposed change, such balancing was implicit in the trial court's modification analysis. *In re Marriage of Murphy*, 48 Wn. App. 196, 199, 737 P.2d 1319 (1987).

Similarly here, it is implicit in the trial court's detailed

analysis of the evidence that the court weighed numerous factors in concluding that a change in the residential schedule was in the best interests of the child. As revealed by the trial court's own words, "Judges have great concern in this area for making an error which could result in very serious ramifications, particularly to the children."

The record amply supports the trial court's decision to modify the parenting plan. Accordingly, we affirm.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

SEINFELD and ARMSTRONG, JJ., concur.