# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

In the Matter of the Marriage of:

SARA VALENCIA,

               Appellant,

   and

GUSTAVO VALENCIA,

               Respondent.

No.  53184-4-II

UNPUBLISHED OPINION

SUTTON, A.C.J. — Sara and Gustavo Valencia are the parents of two teenage girls, VV and NV.  They have been involved in a protracted conflict over their children since 2013.  After a trial on a petition for modification of the parenting plan and an objection to Sara's proposed relocation of the children out of state, the trial court entered detailed findings of fact, conclusions of law, a final parenting plan, and final orders.  The trial court placed VV and NV with Gustavo and imposed RCW 26.09.191 restrictions on Sara's decision-making and residential time with the children due to her repeated withholding and alienation of the children, abusive use of conflict, obstruction, and refusal to obey court orders for visitation and contact.  Sara[1] appeals the trial court's orders[2] that

---

[1] We refer to Sara and Gustavo by their first names to avoid confusion; we intend no disrespect.

[2] The orders on appeal are: Final Order and Findings on Objection about Moving with Children and Petition about Changing a Parenting/Custody Order (Relocation), Clerk's Papers (CP) at 11; Final Order and Findings on Petition to Change a Parenting Plan, Residential Schedule or Custody Order, CP at 18.

denied relocation, granted modification, imposed restrictions on her, and changed residential placement of the children. She also appeals a judgment awarding Gustavo attorney fees and costs due to Sara's intransigence.

Sara argues that the trial court misapplied the law regarding relocation, modification, RCW 26.09.191 limitations, and intransigence. She argues that the trial court erred by making Gustavo the residential parent when their children had no established relationship with him and had been living with her since the marriage dissolution in 2013. Sara argues that the court manifestly abused its discretion by entering unsupported findings of fact, by not stating the evidence it relied upon, and by not addressing each relocation factor. Additionally, Sara claims that the court erred by allowing counselor Jennifer Knight to testify about actions Sara may have taken in 2014, by placing 100 percent of the blame on Sara, and by finding that Gustavo participated in Triple P counseling, but Sara did not. Sara also argues that the trial court's findings do not support the entry of a judgment awarding Gustavo attorney fees based on her intransigence. Both parties request an award of appellate attorney fees and costs.

We hold that substantial evidence supports the findings, and that the trial court did not misapply the law or abuse its discretion. Thus, we affirm the trial court's orders denying relocation, granting modification, imposing RCW 26.09.191 restrictions on Sara, entering a new parenting plan, and entering a judgment for attorney fees and costs based on Sara's intransigence. We award Gustavo reasonable appellate attorney fees and costs. Sara's request for appellate attorney fees and costs is denied.

FACTS

I. BACKGROUND

A. ESTABLISHMENT OF THE 2013 PARENTING PLAN

Sara and Gustavo divorced in 2013 when their daughters, VV and NV were ages 7 and 6 respectively. The parenting plan designated Sara as the custodial parent and contemplated co-parenting by joint decision-making for health care, daycare, and educational decisions. At the time, Gustavo worked as a carpenter and lived in Chula Vista, California, and Sara worked in the U.S. Army Reserves and lived in Everett, Washington. The parenting plan granted Gustavo regular visitation and alternating holidays with the children.

Paragraph 3.14 of the parenting plan contained the statutory notice requirements for child relocation, RCW 26.09.430-.480. It included the following relevant provisions:

> 6.1    Both parents desire to remain responsible and active in their children's growth and development consistent with the best interest of the child. The parents will make a mutual effort to maintain open, ongoing communication concerning the development, needs and interests of the children and will discuss together any major decisions which have to be made about or for the children.
>
> 6.2    The children shall have liberal telephone privileges with the parent with whom the children are not then residing without interference of the residential parent. If the parents cannot agree on the definitions of "liberal" it shall be defined as one telephone call per day at a reasonable hour and for a reasonable duration. The daughters have their own cell phone (one) which shall be accessible to both parents. The children shall also have liberal email and Skype and/or FaceTime privileges as well. None of these modes of communication shall be monitored or interfered with by the parent who has the children in his or her home at the time.
>
> 6.3    Each parent shall have equal and independent authority to confer with school, daycare and other programs with regard to the children's progress and each parent shall have free access to school, daycare, and other records. All education and daycare decisions must be jointly made by the parents (see also 4.2).

6.4     Each parent is to provide the other parent promptly upon receipt with information concerning the well-being of the children, including, but not limited to, copies of report cards, school meeting notices, vacation schedules, class programs, requests for conferences, results of standardized or diagnostic tests, notices of activities involving the children, samples of school work, order forms for school pictures, all communications from health care providers, the names, addresses and telephone numbers of all schools, health care providers, regular daycare providers, and counselors, unless this information is available to both parties.

. . . .

6.11     The children shall engage in counseling with an agreed-upon counselor covered by mother's insurance. The children shall not be seen by Pamela Elderain or any other counselor or therapist who has seen mother or father in a therapeutic setting. The children shall remain in counseling as long as it's recommended by their counselor.

. . . .

6.13     Each parent shall keep the other apprised of his or her current residence address and residence telephone number. Notification of any change must be provided within 24 hours of the change.

Ex. 1.

B.  COMPLIANCE WITH THE 2013 FINAL PARENTING PLAN

The final parenting plan's requirements for joint decision-making and regular contact and visitation by Gustavo with VV and NV never materialized. Between November 2013, shortly after the plan was entered, and October 2018, when trial began, Sara regularly interfered with Gustavo's relationship with the children. After the girls returned from their 2014 spring break visit with Gustavo, VV refused to see or talk to Gustavo and would not participate in counseling to address the issue.

The following year, in June 2015, Sara filed a petition to modify the parenting plan and preclude Gustavo from visitation with VV. In her petition, Sara alleged:

4

The children's environment under the custody decree/parenting plan/residential schedule is detrimental to the children's physical, mental or emotional health and the harm likely to be caused by a change in environment is outweighed by the advantage of a change to the children.

. . . .

Gustavo Valencia has a history of acts of domestic violence against [Sara] of which [VV] is aware. [VV] has expressed her desire not to spend time with her father and forcing her to do so may cause irreparable emotional harm to her.

. . . .

The older child, [VV], has expressed her wishes not to spend time with her father to both her counselor and her mother. Requiring her to continue to have visitation with her father will be detrimental to her emotional well-being and is not in her best interest.

Ex. 3.

Gustavo denied the allegations and asked that the modification petition be denied due to no adequate cause. Gustavo alleged that Sara was violating the parenting plan by committing custodial interference and alienation. She then requested an ex parte temporary restraining order on June 8, 2015.

A court commissioner granted Sara's petition for a temporary restraining order against Gustavo as to VV. The order required Gustavo to undergo a psychological evaluation and further required both Gustavo and VV attend reunification counseling sessions prior to resuming visitation. Dr. Mariela Shipley, Psy.D., prepared the report on Gustavo's psychological evaluation. Dr. Shipley found that Gustavo had been very involved with both girls and that while Sara was deployed overseas, he also was the primary parent for Sara's two older children. Dr. Shipley also found that Gustavo was sad and frustrated that he could not be more involved with his children. Based on the evaluation, Dr. Shipley found that there was "no evidence of major psychological

disturbances in Mr. Valencia's overall presentation, or any propensity for harmful behavior or problems . . . . Consequently, it does not appear that there are any factors that would render [him] unfit to care of his young children." Ex. 50.

C. COURT APPOINTED GUARDIAN AD LITEM (GAL) AND REUNIFICATION PROFESSIONALS

In March 2016, the trial court appointed GAL Suzanne Dircks to evaluate the Valencia family. The court also appointed a number of professionals to provide reunification counseling and supervised visitation.

Sara continually violated the parenting plan by monitoring and interfering with Gustavo's text message, email, and telephone communications with the children. Sara read the text messages, did not allow private text messages to be sent, and lost the girls' cell phones and did not replace them. Sara violated the joint decision-making provision by not keeping Gustavo apprised of the decisions regarding the children's healthcare and by not including him in the decisions. Sara also violated the parenting plan by moving and not providing Gustavo with addresses where the children were living or attending school.

In May 2016, Gustavo moved back to Washington to focus on reunification with VV, whom he had not seen or spoken to since the summer of 2014. The court ordered Sara to take VV to reunification counseling with Rochelle Long, which Sara did. Long interviewed NV who described her dad as "loving, kind, and a good dad" and wished her sister VV could be with her when NV visited Gustavo. Ex. 204. VV described her dad as "being nice, loving, and can expect a lot from him at times." Ex. 204; Report of Proceedings (RP) at 267. Long recommended a transition plan to reunify the children with their father, and recommended that Sara obtain a psychological evaluation to assist with the reunification therapy process and address parental

alienation. Shortly after Long's recommendation, Sara "raised bias and licensing issues" against Long, and as a result, Long was removed as a counselor for the family. RP at 876.

The court next appointed reunification counselor, Jennifer Knight. Knight met with the family 22 times; two additional sessions were scheduled, but Sara refused to deliver the children to these sessions. Knight testified that Sara described Gustavo as a "monster" and said he "wasn't capable of being a nurturing father." RP at 376. Knight testified that Gustavo's "response[s] [were] appropriate given the circumstances." RP at 376-77. Knight also testified that no "domestic violence [was] ever reported by the girls from the time the divorce was done through any point in counseling." RP at 414-15. Knight found that Sara encouraged the girls to write letters threatening suicide if they had to visit their father, which they later admitted to Knight were not true.

Knight concluded that both girls showed classic signs of "parental alienation." RP at 379, 406. The girls "parroted" Sara's negative comments about Gustavo, called him a monster, and could not recall any good memories of their childhood with him. RP at 381. The girls had not seen their father with any regularity, nor could they provide Knight with any reason why they could not or would not see their father. Knight testified that removing the girls from the offending parent, here Sara, was the only option for reversing the effects of alienation—otherwise they would not be able to overcome the alienation from their father.

The court ordered Kate Lee to provide supervised visitation for the girls with Gustavo from March to May of 2017. During this time, Sara expressed confusion as to dates and times, causing Lee to cancel supervised visitation dates. During one visitation, Lee observed one of the children attempting to bait Gustavo by being extremely disrespectful and surreptitiously recording his response on her cell phone. The other child made a false accusation of physical abuse against

7

Gustavo claiming that he grabbed her arm at the end of a supervised visit, which visit Lee witnessed and testified that the incident had not occurred.

The court also ordered Sara and Gustavo to attend co-parenting classes. The first co-parenting counselor, Bev Polhamus, provided co-parenting "communication tools" and acted as a "mediator." RP at 524. Counseling with Polhamus abruptly ceased due to Sara objecting to Polhamus's services because her office was located in the same building as Long. The court appointed another co-parenting counselor, Lori Harrison, in November 2017. Harrison expressed concern that the two girls were being subjected to a loyalty-bind. She explained that a loyalty-bind exists when "the children perceive their residential parent has having difficulty with the other parent or not liking the other parent, they will also adopt that thought pattern." RP at 470.

After individual sessions and one joint session, no additional co-parenting sessions occurred with Harrison. Sara refused to schedule sessions that did not interfere with Gustavo's work schedule, during times when the counselor had appointments available, or when Gustavo wanted to schedule appointments. Thus, due to Sara's refusal to schedule in good faith, co-parenting counseling with Harrison ceased. When Gustavo suggested an alternative counselor, Sara did not respond.

In December of 2017, Gustavo initiated another reunification counseling program, called Triple P. Both Sara and Gustavo communicated with a Triple P provider, but scheduling issues with Sara again caused this reunification program to end.

GAL Dircks conducted an investigation, reviewed all relevant records, and interviewed the following: Sara and Gustavo; VV and NV; references for Sara and Gustavo; Gustavo's sister,

mother, and father; and the court ordered professionals. In her report to the court, GAL Dircks stated the following:

> This has been a very drawn out contentious case. Contributing factors were negative comments from the older siblings and Sara which negatively influenced the girls and Gustavo comes across as extremely intense and I think this frightens the girls. The girls have been given a lot of power . . . which needs to change. In my opinion, the girls need to be told that they have no choice in the visitation.

Ex. 202.

In September 2017 the GAL recommended a detailed plan for the girls to have regular contact and visits with Gustavo. This detailed plan was never fully implemented due to Sarah's scheduling issues and conflicts with the court ordered professionals.

D. SARA'S RELOCATION PETITIONS – GUSTAVO'S OBJECTION AND REQUEST TO MODIFY THE PLAN

On May 24, 2018, Sara filed her third relocation notice of intent to move with children from Joint Base Lewis-McChord to Fort Hunter Liggett in California.[3] The notice stated that Sara was moving with the children, now 13 and 12 years of age, due to receiving work orders changing her permanent duty station and that the orders directed her to report to the new duty station by July 9, 2018. The notice listed no contact information regarding the move other than a phone number. The notice also stated that the reason that only 5 days' notice was given instead of the required 60 days' notice was due to Sara "not know[ing]" and that Sara could not "postpone th[e] move." Ex. 109. In the notice, Sara also stated that she wanted to change the current parenting/custody order which was pending with the court.

---

[3] The first notice of intent to move with the children was filed shortly after the 2013 parenting plan was entered, locating Sara to Snohomish/ King County. The second notice listed intent to move with children to Joint Base Lewis-McChord.

One week before, on Gustavo's motion, the court entered a stipulated temporary family law order. The order reinstated that the parties: engage in co-parenting counseling, maintain the children's therapy, and resume Gustavo's telephone communications and supervised visitations with the children.

On June 27, 2018, Gustavo filed for an immediate restraining order listing irreparable harm to his relationship with his children and to the ongoing reunification process. He alleged that Sara has continually engaged in a pattern of abusive use of conflict and parental alienation to impair his relationship with the children. Gustavo also filed an objection and response to Sara's request to change the current parenting/custody order. Gustavo's objection listed the facts that he had moved back to Washington in May 2016 to focus on reunification, he would be unable to find employment in the remote area in California, the children's education in Washington would be disrupted, the children would be removed from their Washington friends, family, and counselors, and irreparable harm to his current relationship with NV and the on-going reunification process with VV would occur.

## II. TRIAL

Trial occurred in the fall of 2018. Sara and Gustavo testified, as did the following court ordered professionals: Jennifer Knight, Kate Lee, and Lori Harrison. Their testimonies are consistent with the facts above.

### A. SARA'S TESTIMONY

Sara testified that four months after the 2013 parenting plan was entered, Gustavo emailed her inquiring as to where she had moved. Sara testified that she "did not" respond or provide Gustavo with the children's address. RP at 568. Sara testified that even one year later, in 2015,

she still had not provided Gustavo with the children's physical address. Sara testified that the court ordered her in 2016 to provide Gustavo with her updated address, and she again refused to provide the address, stating "safety concerns." RP at 350. In April 2017, Sara provided a relocation notice to the Pierce County Superior Court, but failed to provide her home address or school address for the children, and never updated the information. In May 2018, Sara again provided a notice of relocation through the court, but the notice did not provide any contact information and only provided 5 days' notice of the move. Sara had not provided Gustavo with an address or where the children were living or going to school, until the first day of trial in October 2018, after having relocated to California with the children.

Sara testified that she did not provide Gustavo with the children's school information. In fact, she had never listed Gustavo as an emergency contact on any of the children's school records.

Sara acknowledged that per the court's order, the girls were to have their own phones to freely communicate with Gustavo and she was not to monitor their communication with their father. Sara admitted that she consistently read the children's text messages to verify whether the messages were "fine" and "what was happening." RP at 567.

As to visitation with the girls, Sara explained that there was no visitation issues and that Gustavo had his 2014 spring and summer break visitations with the girls. Upon her return from the summer visitation of 2014, VV did not want to speak with Gustavo. Sara indicated that upon their return, the girls were "happy" and "didn't report anything unusual." RP at 301. VV never told Sara the reason why she did not want to speak to her father and Sara did not know the reason.

Sara testified that the 2013 parenting plan provided for joint decisions on non-emergency healthcare. But she admitted that she did not provide Gustavo with the names of all the counselors,

11

doctors, and medical providers of the girls. Sara also took VV to a counselor, Kathi Jackson, in December 2014, and enrolled her in counseling for purposes other than as ordered in the parenting plan without telling Gustavo. Sara acknowledged that she was "wrong" by not disclosing this information to Gustavo. RP at 561.

Sara alleged that, after NV had a visit with Gustavo in 2015, NV had a medical issue. She admitted that she did not follow-up treatment after it was diagnosed, nor did she inform Gustavo of NV's condition. Upon questioning by the court, the court confirmed that there was no evidence that indicated "anything awry here occurred." RP at 342-343. Sara testified at trial that she was "not alleging" any sexual abuse. RP at 619.

The parenting plan required that the children "engage in counseling with an agreed-upon counselor covered by mother's insurance." Ex. 1. Sara testified that she and Gustavo scheduled with Knight immediately after being ordered to do so, and that there were no other issues in the summer of 2016. Sara stated that she "was not aware . . . of why [Knight] ceased her counseling for the girls." RP at 503, 508. Sara explained that Lee was assigned for supervised visits once a week, but "[u]fortunately, it didn't happen." RP at 509. Sara did not participate in the visits, but testified that the children did not want to participate and were "disengaged." RP at 510. She stated that she encouraged the visits and drove the girls two hours each way for the supervised visits. After finding out that one visitation included watching movies, Sara stated, "I was concerned that there was no interaction . . . my understanding of these visits were meant to engage them in communication, building a relationship, building that trust, and there was no communication during the movies. They're just sitting in a room together watching a movie." RP at 515. Sara

testified that it was her understanding that the reason the visitation stopped "was that [they] were waiting on Mr. Valencia" to schedule. RP at 515.

B. GUSTAVO'S TESTIMONY

Gustavo testified that Sara interfered with his relationship with the girls beginning right after the dissolution, citing numerous examples of Sara's continual pattern of abusive use of conflict and parental alienation to impair his relationship with the children. He explained that he had residential time scheduled with both children for spring break in 2014, but Sara could not afford to pay her portion of the required transportation. The children's paternal grandfather intervened and paid for Sara's share of the air fare, but Sara did not reimburse the grandfather. Sara also gave Gustavo the wrong dates for the children's summer vacation in 2014.

Gustavo testified that the 2014 summer visit with the children was "a blast. It was probably the best summer of my life. Probably theirs too. They were amazing with me. They were amazing with their family. They were loving. They were warm. They were happy. We had an amazing summer." RP at 65. The day after VV returned from summer 2014 visitation, she allegedly did not want to speak to him on the phone. Gustavo testified, "This was the first time that [he] knew that [VV] didn't want to talk to [him]" and that he was "still waiting for a reason why." RP at 66; 99.

Gustavo testified that he had visitation with only NV since the summer of 2015. Sara shortened his spring break visit in 2016 and tried to give him the wrong summer vacation dates. By trial in October 2018, Gustavo had not had any regular visitation with VV for over four years, and had only had irregular visitation with NV since the summer vacation of 2016. Regarding Gustavo's after school Wednesday visitation with NV, Sara often refused to deliver NV to

Gustavo, and refused to provide him with a school or physical address so that he could pick her up.

As to telephone communication, Gustavo testified

I never was able to have private conversations with my daughters ever. They were always to be monitored by either Sara or her [sic] older brother and sister. Talking to them on the phone was always uncomfortable for both me and my daughters. It was just I could tell somebody was there. In fact, they would tell me on the phone that somebody was there.

RP at 720. Gustavo and NV mostly communicated by text messaging. Sara monitored their telephones so he and NV had to be secretive when communicating and NV would delete text messages so that Sara would not be unaware of their communication.

Sara took approximately four cell phones from VV and NV that were provided by Gustavo. Gustavo would lose contact with the girls for weeks, and sometimes months, at a time. Lost or non-working cell phones were constantly an issue. In February 2016, Gustavo flew from California to Washington to personally deliver a cell phone to them after Sara had cut off all contact between him and the children. Another phone that was missing was discovered hidden in a drawer under Sara's control at a later date.

As to travel arrangements, Gustavo testified that Sara refused to make joint decisions and instead created issues with Gustavo's attempts to exercise visitation, including him having to "buy plane tickets . . . the whole 100 percent of it, and still not knowing if [the] girls were going to be on the plane or not." RP at 91. Sara refused to respond to Gustavo about the timing of travel and flights for the children which escalated the cost of travel.

Gustavo testified that he had no idea about how many times his daughters may have been to the hospital, dentist, or orthodontist. He explained that in 2015, he "flew from San Diego to

14

meet with the counselor, Kathi Jackson, in Snohomish County [because he] thought [it] was going to be a co-counseling with [him,] [VV] and Mrs. Jackson, but [VV] did not show up to that meeting." RP at 82. Gustavo testified that Jackson was only going to work with Sara, she refused to work with him, and a judge ruled that because Jackson's counseling was not joint, they were not to utilize her for counseling. Gustavo testified regarding his participation in the court ordered counseling, co-parenting counseling, supervised visitation, and to the multiple scheduling conflicts that occurred with Sara.

Gustavo testified that he paid $1,125.00 to GAL Dircks, approximately $1,000.00 to Kate Lee, approximately $400.00 to Beverly Polhamus, approximately $2,000.00 to Jennifer Knight, approximately $200.00 to Lori Harrison, approximately $200.00 to the Triple P program, approximately $1,000.00 to Rochelle Long, approximately $200.00 to Kathy Jackson, $18,832.84 in attorney's fees to his trial counsel, and approximately $40,000.00 to his two previous attorneys. Gustavo's testimony regarding these expenses and fees was unrebutted.

## III. TRIAL COURT'S FINDINGS AND CONCLUSIONS

The trial court entered written findings and conclusions about each relocation factor. The court denied Sara's relocation petition, concluding that relocation would have a detrimental effect that outweighed any benefit to Sara and the children, and that allowing relocation would stop all reunification efforts and irreparably impair Gustavo's relationship with his children. The court granted modification of the parenting plan, changing the primary residential placement of the children from Sara to Gustavo. The court concluded that there had been a substantial change in the circumstances of the children and the modification was in the best interest of the children. The trial court's order stated that:

> [Sara's] intentional, consistent, insidious efforts to alienate the children from [Gustavo], create conflict and impede [Gustavo's] normal and loving relationship with his children rises to the level of an abusive use of conflict. Based upon the actual detriment to the children and the potential for future harm, the children shall be placed in the primary residential care of [Gustavo]. The court finds this change is in the best interests of the children. This transition shall occur as soon as possible. The father shall enroll the children in school and individualized counseling as soon as possible.

CP at 5. The court imposed RCW 26.09.191[4] restrictions on Sara's residential time after finding she engaged in an abusive use of conflict which had the potential to be harmful to the children. The court ordered that all of Sara's parenting time be professionally supervised for four hours on weekends and ordered her to obtain a psychological evaluation with a parenting component to address the conflicts she created regarding the parenting plan, and acknowledge her role in alienating VV and NV from Gustavo.

The trial court also found that Sara had engaged in abusive use of conflict and intransigence which includes "engaging in obstruction, refusal and interference with court orders concerning visitation and contact." CP at 40. The court further found that Sara engaged in a continual pattern of obstruction "involving refusal to cooperate with the [GAL], refusing to allow visitation, interfering with court ordered visitation, threatening administrative action against witnesses, and falsely alleging sexual abuse of a child." CP at 40. Based on Sara's intransigence, the court awarded Gustavo attorney fees and costs of $40,000.00 and entered a judgment.

Sara appeals the orders denying relocation, granting modification, and awarding Gustavo attorney fees and costs.

---

[4] The legislature amended RCW 26.09.191 in 2019. LAWS OF 2019, ch. 46 § 5020. Because these amendments are not relevant here, we cite to the current version of this statute.

## ANALYSIS

### I. STANDARDS OF REVIEW

We review a trial court's decisions dealing with the welfare of children for an abuse of discretion. *In re Marriage of Horner,* 151 Wn.2d 884, 893, 93 P.3d 124 (2004). Relevant here, a court has authority to modify a parenting plan and impose restrictions under RCW 26.09.191 including in the context of a relocation, to the same extent it has such authority at the time of dissolution. *In re Marriage of Watson*, 132 Wn. App. 222, 232, 130 P.3d 915 (2006). Discretion is abused if the court's decision is manifestly unreasonable or based on untenable grounds or reasons. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). "Given the strong interest in the finality of marriage dissolution proceedings, we defer to the trial court and will affirm [its decision], 'unless no reasonable judge would have reached the same conclusion.'" *In re Marriage of Rostrom*, 184 Wn. App. 744, 750, 339 P.3d 185 (2014) (quoting *In re Marriage of Kim*, 179 Wn. App. 232, 240, 317 P.3d 555 (2014)).

We uphold trial court's findings if supported by substantial evidence. *In re Marriage of Raskob*, 183 Wn. App. 503, 510, 334 P.3d 30 (2014). Substantial evidence exists if the record contains evidence of a sufficient quantity to persuade a fair-minded person of the truth of the declared premise. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). "Our role or function is not to substitute our judgment for that of the trial court or to weigh the evidence or credibility of witnesses." *In re Marriage of Rich*, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996). The person challenging the findings of fact bears the burden of demonstrating that substantial evidence does not exist. *In re Marriage of Grigsby*, 112 Wn. App. 1, 9, 57 P.3d 1166 (2002). We review de novo whether the trial court's findings of fact support its conclusions of law. *Raskob*,

183 Wn. App. at 510. Unchallenged findings of fact are verities on appeal. *In re Marriage of Akon*, 160 Wn. App. 48, 57, 248 P.3d 94 (2011).

A trial court also may impose restrictions on a parent's residential time upon finding that a parent has engaged in:

> The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development;
>
> A parent has withheld from the other parent access to the child for a protracted period without good cause; or
>
> Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

RCW 26.09.191(3)(e), (f), and (g).

## II. RELOCATION

Washington's child relocation act (CRA), RCW 26.09.405–.560 governs child relocation. "The CRA shifts the analysis away from only the best interests of the child to an analysis that focuses on both the child and the relocating person." *Horner*, 151 Wn.2d at 886-87. The CRA creates a presumption that the relocation will be allowed. RCW 26.09.520.[5] To rebut the presumption, the objecting party must prove by a preponderance of the evidence that "the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person." RCW 26.09.520. The court is required to consider the following relevant relocation factors:

> (1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;

---

[5] The legislature amended RCW 26.09.520 in 2019. LAWS OF 2019, ch. 79 § 3. Because these amendments are not relevant here, we cite to the current version of this statute.

(2) Prior agreements of the parties;

(3) Whether disrupting the contact between the child and the person seeking relocation would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;

(4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;

(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;

(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;

(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;

(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;

(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also; and

(10) The financial impact and logistics of the relocation or its prevention[.]

. . . .

RCW 26.09.520(1)-(10). When making a determination about a child's relocation, the record must indicate that the trial court has considered *every* relevant statutory factor in RCW 26.09.520. *Horner,* 151 Wn.2d at 894.

Sara argues that the court misapplied the law regarding relocation, modification of residential placement, imposition of restrictions on her, and intransigence. She argues that the trial court abused its discretion because the findings she challenges are not supported by substantial evidence and conflict with or are contradictory to the evidence, and that the court failed to

articulate the evidence relied upon, failed to provide for the children's best interests, did not consider all relocation factors, and based its decisions on untenable grounds. Most of Sara's arguments ask us to reweigh the evidence and the witnesses' credibility. Below we review each relevant relocation factor, the trial court's related findings, and a summary of the evidence presented in support.

A. RCW 26.09.520(1) – CHILD'S SIGNIFICANT RELATIONSHIPS

Regarding relocation, the trial court first considers "[t]he relative strength, nature, quality, extent of involvement and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life." RCW 26.09.520(1). Here, the record shows that the court considered this factor and entered appropriate findings which we hold are supported by substantial evidence. Sara did not support Gustavo's reunification efforts with VV in good faith, and her abusive use of conflict and parental alienation was harmful to the children's best interests. The court found that Gustavo had a good relationship with NV up until his move to Washington in May 2016, but Sara resisted his efforts to visit NV after summer vacation of 2016 until trial.

The court's findings detail Gustavo's repeated unsuccessful attempts to maintain relationships with the children between 2013 and 2018. The court found that Sara's obstruction created an environment where the children believed that they had a choice in visiting Gustavo. The trial court found the professionals' testimony—that there was no legitimate reason why the girls should not be reunified with Gustavo except for Sara's interference—credible. We do not reweigh the evidence or witness credibility on appeal. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007).

B. RCW 26.09.520(2) – PRIOR AGREEMENTS OF THE PARTIES

The trial court must next consider the prior agreements of the parties. RCW 26.09.520(2). Substantial evidence supports the court's finding that "the parties agreed to attempt to reunify the father's relationship with the children through co-parenting counseling therapy and assistance by professionals. All professionals are here in Washington. If the mother was allowed to relocate it would block the entire reunification process." CP at 12.

C. RCW 26.09.520(3) – DISRUPTION OF CONTACT

The trial court next must consider "[w]hether disrupting the contact between the child and the person seeking relocation would be more detrimental to the child than disrupting contact between the child and the person objection to the relocation." RCW 26.09.520(3). Substantial evidence supports the court's finding that disrupting the children's contact with Sara, the moving parent, would not be more detrimental to the children than disrupting their contact with Gustavo. The court found it would be extremely disruptive to the reunification of the children with Gustavo if the move were allowed and that allowing Sara to relocate would make it virtually impossible for Gustavo's relationship with his daughters to be repaired.

D. RCW 26.09.520(4) – LIMITATIONS

The trial court also must consider "[w]hether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191." RCW 26.09.520(4). The court found that Sara's "intentional, consistent, insidious efforts to alienate the children from [Gustavo], create[d] conflict and imped[ed] the father's normal and loving relationship with his children" and that it rose "to the level of an abusive use of conflict." CP at 5. The court further

found that Sara's abusive use of conflict "has the potential to harm the children." CP at 19. The court properly imposed RCW 26.09.191 restrictions on Sara's residential time.

The court entered specific findings citing numerous examples of Sara's refusal to support reunification. Substantial evidence was presented at trial that Sara (1) refused to cooperate with Gustavo's residential time, including traveling and scheduling arrangements; (2) refused to provide Gustavo with her current home address when she relocated; (3) refused to provide Gustavo information related to the children's health care and mental health needs; (4) restricted phone contact by the children; (5) refused to fully cooperate with co-parenting and reunification counseling; and (6) neglected to adequately provide for the children's mental health needs.

Sara admitted at trial that she refused to cooperate and provide Gustavo with her home address, or information about the children's schools, health care or mental health. Substantial evidence supports the trial court's findings and they support the RCW 26.09.191 restrictions imposed on Sara's residential time.

E.  RCW 26.09.520(5) – GOOD FAITH AND REASONS FOR SEEKING OR OPPOSING RELOCATION

Next, the trial court must consider "[t]he reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation." RCW 26.09.520(5). Substantial evidence supports the court's finding that Sara's request to relocate was made in bad faith and Gustavo's objection was based on good faith to reunify with his children. Although the evidence was conflicting regarding a hardship waiver, the court found that, based on Sara's testimony, she could have requested a hardship from the Army to stay in Washington for the purposes of the reunification therapy and co-parenting counseling as well as for VV's counseling needs.

The court found that Gustavo objected to relocation in good faith. Gustavo could not follow Sara because she was relocating to an isolated area of California. Gustavo would not be able to find employment and had no family in the area. Further, the court found that granting relocation would impair reunification. The court found that Gustavo had moved back to Washington in 2016 specifically to engage in reunification counseling with VV and that he had a very good relationship with NV.

Although counselor Long recommended a transition plan for reunification, Sarah did not support reunification in good faith; she also had the children write letters, which were not true, threating suicide. The court also found that Sara's pattern of alienation and abusive use of conflict and intransigence had prevented Gustavo from successfully reunifying with his children over the past six years, despite the efforts by the court ordered professionals. Sara had moved twice without providing her home address, school and daycare providers' information, and sought relocation again without providing updated contact information. The court concluded that allowing Sara to relocate would "result in further alienation," make the children's relationship with their father, "irreparable" and impossible to restore. CP at 13. Substantial evidence was presented at trial to support these findings, and they support the court's conclusions of law as to this factor.

F.  RCW 26.09.520(6) – IMPACT OF RELOCATION

Next, the trial court must consider "[t]he age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child." RCW 26.09.520(6).

The trial court found that:

> [Sara's] intentional, consistent, insidious efforts to alienate the children from [Gustavo], create conflict and impede the fathers normal and loving relationship with his children rises to the level of an abusive use of conflict. Based upon the actual detriment to the children and the potential for future harm, the children shall be placed in the primary residential care of their father. The court finds this change is in the best interests of the children. This transition shall occur as soon as possible. [Gustavo] shall enroll the children in school and individualized counseling as soon as possible.

CP at 5. The record shows that the court considered that Gustavo made repeated efforts at regular contact and visitation to reunify with VV and NV, and that Sara interfered with these efforts for six years by engaging in an abusive use of conflict and alienation, which was harmful to the children's best interests. Substantial evidence supports the court's findings as to this factor.

G. RCW 26.09.520(7) – QUALITY OF LIFE IN CURRENT AND PROPOSED LOCATIONS

The trial court must consider "[t]he quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations." RCW 26.09.520(7). The court entered specific findings as to the children's schooling proposed in California and found that there were no resources for the children because the area was isolated and remote. Specific data regarding the children's current school district was considered and the court entered findings related to schools and resources. The court also found that Sara had not provided any details concerning the children's school or home so that it was unknown what opportunities or quality of life could be afforded the children at that location. The schools where Gustavo resided in Washington State were newer and more up to date. Based on the record considered by the trial court, these findings are supported by substantial evidence.

24

H. RCW 26.09.520(8) – ALTERNATIVES TO CONTINUE RELATIONSHIP

The trial court must consider "[t]he availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent." RCW 26.09.520(8). Here, the court considered this factor and based on the evidence found that there were no legitimate alternatives to foster the reunification therapy and co-parenting counseling, and also found that further alienation of the children from their father would occur. Substantial evidence supports the trial court's finding that there were no reasonable alternatives.

I. RCW 26.09.520(9) – ALTERNATIVES TO RELOCATION

The court must also consider whether there are any alternatives to relocation or if the other party could relocate as well. RCW 26.09.520(9).

The trial court found that:

> [Sara] could request a hardship [from the U.S. Army] to stay in Washington for the purposes of the reunification therapy and co-parenting counseling as well as [NV's] counseling needs. Additionally, [Sara] has two children from a prior relationship that are young adults who may be staying in Washington. It is unknown if they are relocating to California or not. There could be alternatives for the children to stay in Washington.

CP at 15. Although there was conflicting testimony by Sara regarding a hardship waiver and whether her older children would also move with her to California, the court found Gustavo's testimony in this regard to be more credible, and we do not reweigh credibility on appeal. *Rockwell*, 141 Wn. App. at 242. The court also found that all of the reunification counselors were in Washington and that moving again would disrupt the reunification process. However, Gustavo testified that he could relocate back to Chula Vista to have the support of extended family on both sides or remain in Washington if that is what the judge ordered. These findings are supported by

the conditions at the time of the trial and Gustavo's testimony that he could relocate, does not change that. Further, the findings are supported by substantial evidence and they support the court's conclusions.

J. RCW 26.09.520(10) – FINANCIAL IMPACT

Finally, the trial court must consider "the financial impact and logistics of the relocation or its prevention." RCW 26.09.520(10). Here, the trial court found that there would be a negative impact if Gustavo had to move again, after relocating in May 2016 back to Washington. It would be harder for him to restart and he would lose all of his seniority at work, family and friends. There was ample evidence at trial of the impact on Gustavo, the court's consideration of the impacts, and thus, the court's findings are supported by substantial evidence.

In sum, we hold that the trial court's findings on relocation were supported by substantial evidence based on the entire record and these findings demonstrate that the court considered each relocation factor. These findings support the court's conclusion that relocation was not in the children's best interests. Thus, the trial court did not err by denying Sara relocation, and we affirm the relocation order.

### III. MODIFICATION

RCW 26.09.260 addresses the grounds for modifying a parenting plan consistent with the provisions in RCW 26.09.184 and .187 for formulating a permanent parenting plan. RCW 26.09.260(2) allows for modification of a parenting plan when:

> (c) The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child[.]

Relevant here, RCW 26.09.260(6) provides that the court may modify residential placement under the relocation statute without a showing of adequate cause. RCW 26.09.260(6) also states that in determining whether to modify a parenting plan pursuant to a relocation,

[T]he court shall first determine whether to permit or restrain the relocation of the child using the procedures and standards provided in RCW 26.09.405 through RCW 26.09.560. Following that determination, the court shall determine what modification pursuant to relocation should be made, if any, to the parenting plan or custody order or visitation order.

The court may draw a reasonable inference that destructive behavior by a parent that constitutes a detrimental environment at the time the petition for modification was filed would continue absent evidence that it had ceased. *In re Marriage of Velickoff*, 95 Wn. App. 346, 356, 968 P.2d 20 (1998). Specifically, in *Velickoff*, restricting access to medical records and telephone contact was a factor in finding detriment. 95 Wn. App. at 355. Fostering post-dissolution relationships between a child and each parent is paramount and a parent's interference with such relationship is detrimental to the child's best interests. *Velickoff*, 95 Wn. App. at 357; RCW 26.09.002.

Here, the trial court found that the children's environment with Sara was detrimental to their physical, mental, or emotional health and that the harm likely to be caused by a change of environment was outweighed by the advantage of a change to the children. Based on its findings, the court modified the parenting plan, changed residential placement to Gustavo, and imposed RCW 26.09.191 restrictions on Sara's residential time. Sara argues that the findings are not supported by substantial evidence, do not support the trial court's decisions, and are based on "untenable grounds." Br. of Appellant at 29-30. We disagree and hold that the court did not err and thus, we affirm the modification order.

The parenting plan provided for joint decision-making and regular visitation and contact between Gustavo and the children. Sara was required to provide Gustavo updated home addresses, school, health care, dental, and counseling information. The trial court, citing numerous examples, found that for six years Sara blatantly failed to comply with these provisions despite Gustavo's repeated efforts and as a result, the children were being harmed and the current residential placement with Sara was not in their best interests. Further, the trial court's findings imposing RCW 26.09.191 restrictions are also supported by substantial evidence. These findings support the court's conclusion to modify residential placement of the children from Sara to Gustavo.

In sum, we hold that the trial court did not err and we affirm the modification order.

## IV. OTHER TRIAL ISSUES

### A. TESTIMONY OF JENNIFER KNIGHT

Sara also argues that the trial court erred by overruling an objection based on speculation and improper foundation and allowing counselor Knight to opine as to what actions Sara may have taken when VV would not speak to Gustavo on the phone in 2014. We disagree and hold that the trial court did not abuse its discretion by allowing this opinion testimony.

ER 704 establishes that an expert may provide her opinion on an ultimate issue. "A trial court's decision to admit expert testimony is reviewed for abuse of discretion." *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007).

At trial, Knight was asked about what actions should have occurred after VV stopped speaking to Gustavo. Sara's counsel objected based on lack of foundation and speculation, which objections the court overruled. Knight testified that, in her opinion, the best thing would have been to encourage VV to speak with Gustavo. Knight had met with the family 22 times and was in a

28

position therapeutically to opine about the issues surrounding the family and the children's relationship with Gustavo. She spoke from a therapeutic perspective about a series of actions that, if taken, might have led to a better result for VV's treatment. She also discussed a pattern of alienating behavior by Sara that she observed. We hold that the trial court did not abuse its discretion by permitting Knight to testify as to this opinion.

B.  TRIAL COURT ALLEGEDLY PLACED 100 PERCENT OF THE BLAME ON SARA

Sara also argues that the court erred by placing 100 percent of the blame on her. Sara's argument here asks us to reweigh witnesses' credibility which we do not do on appeal. *Rockwell*, 141 Wn. App. at 242. Thus, her argument fails.

C.  PARTICIPATION IN TRIPLE P PROGRAM

Sara also argues that the court erred by finding that she did not participate in the Triple P program for counseling. Substantial evidence supports this finding because Sara testified at trial that she, in fact, did not attend the Triple P program, she canceled two appointments, and she never scheduled a third one. Thus, we hold that Sara's argument fails.

V.  AWARD OF ATTORNEY FEES AND COSTS BASED ON INTRANSIGENCE

Sara argues that the trial court erred when it awarded Gustavo attorney fees and costs due to her intransigence and that there was no evidence of unreimbursed costs. We disagree and hold that the court did not err.

"[A] trial court may consider whether additional legal fees were caused by one party's intransigence and award attorney fees on that basis." *Raskob*, 183 Wn. App. at 517. "Intransigence is the quality or state of being uncompromising." *Schumacher v. Watson,* 100 Wn. App. 208, 216, 997 P.2d 399 (2000). "'Awards of attorney fees based upon the intransigence of one party have

been granted when the party engaged in foot-dragging and obstruction . . . or simply when one party made the trial unduly difficult and increased legal costs by his or her actions.'" *Raskob*, 183 Wn. App. at 517-18 (internal quotation marks omitted) (alternation in original) (quoting *In re Marriage of Greenlee*, 65 Wn. App. 703, 708, 829 P.2d 1120 (1992)).

Here, the trial court entered three sets of findings related to intransigence. First, the court found that Sara engaged in a "continual pattern of obstruction" because she refused to cooperate with the GAL, refused to allow visitation, interfered with court ordered visitation, threatened administrative action against witnesses, and falsely alleged sexual abuse of a child. CP at 40. Second, Sara started these proceedings in 2013 immediately following the dissolution trial and did not present any credible evidence of domestic violence by Gustavo at the 2013 trial or the 2018 trial, and when directly asked, she admitted that she was not accusing him of this or of sexual abuse. Third, Sara engaged in manipulation of the children, the courts, and Gustavo.

Gustavo testified that he incurred the following unreimbursed costs: $1,125.00 to GAL Dircks, approximately $1,000.00 to Kate Lee, approximately $400.00 to Beverly Polhamus, approximately $2,000.00 to Jennifer Knight, approximately $200.00 to Lori Harrison, approximately $200.00 to the Triple P program, approximately $1,000.00 to Rochelle Long, $200.00 to Kathi Jackson, $18,832.84 in attorney's fees to his trial counsel, and approximately $40,000.00 to his two previous attorneys.

Sara does not specifically contest the substance of these findings, but argues that they did not amount to intransigence. Sara's dispute is over the credibility of the witnesses, which we do not review on appeal. *Rockwell*, 141 Wn. App. at 242. Further, Gustavo's testimony on the attorney fees, costs, and unreimbursed expenses was not rebutted. The trial court's detailed

findings of intransigence support both the court's award and its entry of judgment in the amount of $40,000.00. Because the trial court did not err, we affirm the order and the judgment.

APPELLATE ATTORNEY FEES AND COSTS

Both parties request an award of appellate attorney fees and costs under RAP 18.1. Under RAP 18.1, the prevailing party is entitled to appellate attorney fees and costs when applicable law authorizes the award. *McGuire v. Bates*, 169 Wn.2d 185, 191, 234 P.3d 205 (2010). Here, Gustavo prevails. Therefore, we award Gustavo his appellate attorney fees and costs and deny Sara's request.

CONCLUSION

We hold that the court did not abuse its discretion or err, and thus, we affirm the trial court's orders. We award Gustavo reasonable appellate attorney fees and costs and deny Sara's request.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, A.C.J.

We concur:

WORSWICK, J.

MELNICK, J.

31